AL TECH SPECIALTY STEEL CORPO-
RATION; ARMCO Stainless Steel Divi-
sion, ARMCO, Inc.; Carpenter Technol-
ogy Corporation; Colt Industries, Inc.,
Crucible Materials Group; Guterl Spe-
cial Steel Corporation; Joslyn Stainless
Steel; Republic Steel Corporation; Uni-
versal-Cyclops Specialty Steel Division,
Cyclops Corporation, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 83-1-00107.

United States Court of
International Trade.

May 22, 1987.

Collier, Shannon, Rill & Scott (David A. Hartquist and Laurence J. Lasoff) Washington, D.C., for plaintiffs.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Dept. of Justice (Sheila N. Ziff), for defendant; Linda Concannon, Office of Deputy Chief Counsel for Import Administration, Dept. of Commerce, of counsel.

## OPINION AND ORDER

TSOUCALAS, Judge:

Plaintiffs, domestic stainless steel bar producers, have filed an appeal contesting the final affirmative countervailing duty determinations of the International Trade Administration of the Department of Commerce (ITA or Commerce) in *Certain Stainless Steel Products from Spain,* 47 Fed.Reg. 51,453 (1982). This action is presently before the Court on plaintiffs' motion for judgment on the agency record pursuant to USCIT R. 56.1.[1]

### Background

The ITA began a countervailing duty investigation in response to a petition filed on behalf of domestic manufacturers concerning hot-rolled stainless steel bars, cold-formed stainless steel bars and stainless steel wire rod imported from Spain. 47 Fed.Reg. 10,268 (1982). On August 31, 1982, the ITA published a preliminary determination that, with respect to various Spanish steel producers, short-, medium-, and long-term loan programs conferred benefits which constituted subsidies within

the meaning of 19 U.S.C. § 1677(5) (1982). 47 Fed.Reg. 38,375 (1982). After verification, the ITA published, on November 15, 1982, its final affirmative countervailing duty determination. 47 Fed.Reg. 51,453 (1982). The *ad valorem* estimated net subsidy for Olarra, S.A. (Olarra), a Spanish steel producer subject to investigation, was zero percent. *Id.* at 51,459.

Olarra received short-term working capital loans in 1979 pursuant to the Privileged Circuit Exporter Credit Program. This Spanish Government program mandates that commercial banks make available funds to exporters under preferential terms. On July 5, 1979, Olarra declared voluntary bankruptcy, and in June, 1981, a Spanish court approved a receivership plan for the firm. This plan provided for the aggregation of all pre-bankruptcy debt including various short- and long-term commercial credits as well as the privileged circuit working capital loans. The ITA had preliminarily determined that the *ad valorem* subsidy for medium- and long-term loans to Olarra was zero percent. 47 Fed. Reg. at 38,377. At that time, the ITA noted that before issuing a final determination, it would seek further details concerning Olarra's pre-bankruptcy loans. *Id.* In verifying the data supplied by Olarra, the ITA uncovered new information concerning the details of Olarra's bankruptcy, purchases of Olarra's stock by the Bank of Spain, and the terms of repayment of Olarra's loans. Administrative Record at 1272–77 (hereinafter "A.R. at ———"). The ITA learned that the pre-receivership debt was payable, unless extended to 1989, in monthly installments for the seven years following Olarra's declaration of bankruptcy, without further accrual of interest. A.R. at 1273. In accordance with Spanish law, no payments were made on Olarra's debt between the declaration of bankruptcy and the formal approval of the receivership

---

1. The International Trade Commission (ITC) has determined that an industry in the United States is not materially injured nor threatened with material injury by reason of imports of hot-rolled stainless steel bars and cold-formed stainless steel bars from Spain. 48 Fed.Reg. 540 (1983). Plaintiffs' actions challenging the ITC's final negative determination and the ITA's final affirmative determination were consolidated by court order. Additionally, it was ordered that plaintiffs' challenge to the ITA's determination be resolved prior to the challenge to the ITC's determination. Order of Feb. 27, 1984 (Ford, J.).

plan. In its final determination, the ITA concluded that while Olarra had received benefits from the working capital loans, these benefits ceased to exist when the loans were incorporated in the receivership plan. 47 Fed.Reg. at 51,455. Moreover, these loans were of short duration—no longer than one year—and would have been repaid but for Olarra's bankruptcy. *Id.* Despite these conclusions, the ITA did not exclude Olarra from the final determination since Olarra had "received benefits in the past and may qualify for and obtain preferential loans under the Privileged Circuit Program in the future." *Id.* at 51,458.

### The Parties' Claims

Plaintiffs contest both the substance of, and the adequacy of the explanation for, the ITA's determination that certain benefits conferred on Olarra do not constitute countervailable subsidies. In particular, plaintiffs object to the ITA's treatment of information concerning (a) short-term working capital loans made to Olarra in 1979 (b) the terms of the receivership plan allowing repayment of Olarra's debt without interest and (c) the Bank of Spain's purchases of an equity interest in Olarra. *See Plaintiffs' Motion for Judgment Upon the Agency Record* at 6 (hereinafter "Plaintiffs' Motion").

Plaintiffs view the benefits associated with the operating capital loans as extending beyond the year of receipt into the year of the ITA's investigation, 1981, since the loans were not repaid as originally scheduled. *Plaintiffs' Reply to Defendant's Response to Motion for Judgment Upon the Agency Record* at 5–6 (hereinafter "Plaintiffs' Reply"). They also dispute, *Plaintiffs' Reply* at 9–11, Commerce's contentions that the relief afforded Olarra under the bankruptcy law is a "generally available" benefit that is noncountervailable and which terminates any benefit flowing from the preferential loans made prior to Olarra's voluntary declaration of bankruptcy. *Defendant's Memorandum in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record* at 17 (hereinafter "Defendant's Opposition"). Finally, plaintiffs reject, *Plaintiffs' Motion* at 18–20, defend-

ant's argument that Commerce considered, and properly discounted, information discovered at verification that the Bank of Spain's equity investment in Olarra may have provided a subsidy to the firm. *Defendant's Opposition* at 20. Defendant contends that this Court is barred from reviewing plaintiffs' objections, and in any case, those objections are legally irrelevant since government stock purchases from private shareholders on the open market cannot amount to a countervailable subsidy. *Defendant's Opposition* at 20, 37.

### Discussion

Judicial review in the instant action, commenced pursuant to 19 U.S.C. § 1516a(a)(3) (1982 & Supp. II 1984), is governed by the standard contained in 19 U.S.C. § 1516a(b)(1)(B) (1982) which directs the Court to hold unlawful any determination, finding, or conclusion "unsupported by substantial evidence on the record, or otherwise not in accordance with law." Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed.Cir.1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 126 (1938)). As explained in numerous decisions, and as correctly noted by defendant:

> An agency's interpretation of a statute which it is authorized to administer is "to be sustained unless unreasonable and plainly inconsistent with the statute, and [is] to be held valid unless weighty reasons require otherwise." An agency's "interpretation of the statute need not be the *only* reasonable interpretation or the one which the court views as the most reasonable."

*ICC Indus. v. United States*, 812 F.2d 694, 699 (Fed.Cir.1987) (citations omitted). With that established, the Court turns to a consideration of the questions presented.

### A. *Exhaustion of Remedies*

As a threshold matter, defendant insists that the Court may not properly consider plaintiffs' objections to the ITA's treatment of information, first revealed at verifica-

tion, concerning (a) the repayment terms of preferential loans to Olarra and (b) the Bank of Spain's stock purchases. Plaintiffs' alleged failure to raise these objections "in a timely manner, or even in time to allow Commerce to address their untimeliness in the final determination, constitutes a failure to exhaust their administrative remedies, and an effective waiver of the right to contest these issues on appeal." *Defendant's Opposition* at 21–22. Plaintiffs counter that their claims were timely raised before the administrative agency by virtue of a letter to Mr. Gary Horlick, then the ITA's Deputy Assistant Secretary for Import Administration. More fundamentally, plaintiffs allege that the exhaustion requirement is not applicable since no new issues were raised by the comments, which "solely concern the agency's failure to give sufficient consideration to issues the agency itself uncovered." *Plaintiffs' Reply* at 1.

The chronology of events relevant to this issue can be summarized as follows. At the hearing concerning the ITA's preliminary determination held on September 30, 1982, the hearing examiner set October 14, 1982 as the deadline for the submission of post-hearing briefs. A.R. at 1087. Plaintiffs' counsel expressed concern at the hearing, A.R. at 1044–45, that there might be insufficient time to comment on the forthcoming report of Commerce's verification team. These concerns were reiterated, in more detailed fashion, both in a letter dated October 12, 1982 to Mr. Horlick, A.R. at 1101–03, and in the post-hearing brief submitted on October 14, 1982. A.R. at 1150–52. In the letter to Mr. Horlick, plaintiffs' counsel requested that the deadline for the submission of post-hearing briefs be extended by approximately ten

days after release of the verification report. A.R. at 1102. The Court is not aware of any response to this request but notes, as stated above, that the brief was filed on October 14, 1982, which was the date of the original deadline. By telephone call on October 21, 1982, A.R. at 1312, the ITA notified several parties, including plaintiffs' counsel, that the public version of the verification report, dated October 20, 1982, was available. A.R. at 1250–91. On October 27, 1982, an ITA case handler phoned plaintiffs' counsel inquiring whether comments would be submitted concerning the verification report. A.R. at 1313. Counsel indicated, *inter alia*, that their consultants had comments.[2] By letter to Mr. Horlick, dated November 2, 1982, plaintiffs commented on the verification report. A.R. at 1356–59. The ITA's final determination was signed on November 8, 1982 and was published in the Federal Register on November 15, 1982. A.R. at 1508, 47 Fed.Reg. 51,453 (1982).

The usual statement of the exhaustion doctrine is that to preserve an issue for judicial review it must have been raised at the administrative level "at the time appropriate under [the agency's] practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952). In the instant type of action, the Court is statutorily directed to apply the exhaustion requirement "where appropriate." 28 U.S.C. § 2637(d) (1982).[3] In light of this quoted language, Congress did not intend § 2637(d) to be jurisdictional in nature. *United States v. Priority Prods., Inc.*, 793 F.2d 296, 300 (Fed.Cir. 1986) (dictum); *Timken Co. v. United States*, 10 CIT ——, ——, 630 F.Supp. 1327,

---

**2.** The full text of the memo to the file prepared by the ITA case handler is as follows:

Courtesy call re R.O.V.—Petitioners had not expressed opinion on them—indicated in their post hearing briefs they wanted opportunity to do so. [Petitioners' counsel] said if anything immediately struck them I would be advised—Since they hadn't called—this conversation was a precautionary one—to make sure they hadn't been trying to get the team. [Petitioners' counsel] indicated consultants

had comments—Would talk to them tomorrow to determine if anything needed pursuing.

A.R. at 1313.

**3.** § 2637(d) provides:

In any civil action not specified in this section, the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies.

1334 n. 2 (1986); *Philipp Bros. v. United States,* 10 CIT ——, ——, 630 F.Supp. 1317, 1320, *appeal dismissed on motion of appellee,* App. No. 86–1122 (Fed.Cir. July 18, 1986); *Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 136, 583 F.Supp. 607, 611 (1984).[4] While notions of the integrity of the administrative process, as embodied in the statute, suggest that exhaustion should be the "general rule," *Allen v. Regan,* 9 CIT 615, ——, Slip Op. 85–126 at 5 (Dec. 10, 1985), the courts must resist inflexible applications of the doctrine—characteristic of jurisdictional rules—which frustrate the ability to apply exceptions developed to cover "exceptional cases or particular circumstances ... where injustice might otherwise result" if it were strictly applied.[5] *Rhone Poulenc,* 7 CIT at 134, 583 F.Supp. at 609 (quoting *Hormel v. Helvering,* 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941)); *see also McKart v. United States,* 395 U.S. 185, 201, 89 S.Ct. 1657, 1666, 23 L.Ed.2d 194 (1969) (exhaustion doctrine need not be "applied blindly in every case"); *cf. Kokusai Elec. Co. v. United States,* 10 CIT ——, ——, 632 F.Supp. 23, 28 (1986) (holding that neglect to raise an issue prior to the close of Commerce's investigation will not be excused absent "extraordinary circumstances").

Concomitant with the respect for values of judicial economy and "administrative autonomy" inherent in the application of the exhaustion doctrine, *McKart,* 395 U.S. at 194, 89 S.Ct. at 1663 (quoting L. Jaffe, Judicial Control of Administrative Action 425 (1965)), lies a responsibility for the agency, necessarily vested with control over the administrative proceedings, to allow a sufficient opportunity to raise issues. Thus, in determining whether questions are precluded from consideration on appeal, the Court will assess the practical ability of a party to have its arguments considered by the administrative body.[6] *See American Maritime Ass'n v. United States,* 766 F.2d 545, 566 n. 30 (D.C.Cir.1985) (exhaustion should not operate to prevent a reasonable opportunity to object to significant agency action); *Philipp Bros.,* 10 CIT at ——, 630 F.Supp. at 1324 (issue not precluded from judicial review where there was no opportunity to present it at the administrative level); *cf. L.A. Tucker Truck Lines,* 344 U.S. at 35, 73 S.Ct. at 68 ("Appellee did not offer ... any excuse for its failure to raise the objection ... during the administrative proceeding. Appellee does not claim to have been misled or in any way hampered in ascertaining the facts....").

**4.** It should be noted that even statutes which facially admit of no exceptions to the exhaustion doctrine have been construed as codifying judicially created exceptions to that doctrine. *See, e.g., Washington Ass'n for Television & Children v. FCC,* 712 F.2d 677, 681–82 & n. 6 (D.C. Cir.1983).

**5.** Given the holding with regard to this issue, I need not attempt to catalogue nor discuss the exceptions to the exhaustion rule. Therefore, I do not consider, to what extent, if any, an exception which may be recognized for issues not properly raised but in fact considered by the administrative body, *see, e.g., Natural Resources Defense Council, Inc. v. EPA,* 804 F.2d 710, 714 (D.C.Cir.1986), is relevant to the case at bar.

**6.** Unlike another type of case involving the exhaustion rule, *see, e.g., United States Cane Sugar Refiners' Ass'n v. Block,* 69 CCPA 172, 175 n. 5, 683 F.2d 399, 402 n. 5 (1982) (protest remedy need not be exhausted where "manifestly inadequate"); *Springfield Indus. v. United States,* 11 CIT ——, ——, 655 F.Supp. 506, 507 (1987) (filing of protest would be futile), there is no ques-

tion here concerning a "premature resort to the courts" because all administrative remedies are now closed to plaintiffs. *McKart,* 395 U.S. at 196–97. For this reason, in the instant type of case, claims improperly raised below are generally subject to dismissal. This Court recognizes that both types of cases potentially implicate similar—though not necessarily identical—considerations underlying the exhaustion doctrine, and does not declare that one type of case represents a more compelling candidate for application of that doctrine. *But cf. McKart,* 395 U.S. at 197, 199, 89 S.Ct. at 1663 (suggesting that, in the context of a subsequent criminal prosecution, the termination of the administrative process is a factor to be considered in deciding whether to require exhaustion). The fact remains, however, that review herein is limited to the administrative record, and, as stated earlier, unexhausted claims are normally unreviewable. This underscores the need, not only for private parties to properly raise issues before the agency, but also for the agency both to allow a suitable opportunity to raise those issues and to clarify the procedures for so doing.

■ Defendant does not suggest, nor could it, that plaintiffs were delinquent in submitting the post-hearing brief. Nor does defendant specifically dispute that new information was presented in the verification report that could not have been commented on by October 14, 1982. Instead, defendant would have the Court treat the request by plaintiffs' counsel for approximately ten additional days to submit a post-hearing brief as a jurisdictional bar to consideration of comments submitted twelve days after the verification report became available.

In the instant case, judicial review of plaintiffs' claims is not barred. The Court is unwilling to transmute an apparently unanswered request for additional time into a deadline imposed by the administrative agency.[7] Commerce did not attempt to fix a deadline for the submission of comments to the verification report.[8] Furthermore, the agency's scheduling of the hearing on its preliminary determination and the timing of the release of the verification report placed plaintiffs in a position where it was exceedingly difficult to generate meaningful commentary on the report prior to a few days before the date of completion of the investigation. In any event, plaintiffs commented on information initially uncovered in the verification report before Commerce signed the final dumping determination. *Cf. Kokusai*, 10 CIT at ——, 632 F.Supp. at 27 (claim first raised before publication of duty order where relevant information was available to plaintiff at initiation of Commerce's investigation). Plaintiffs have not "slept on [their] rights," *id.*, and this Court may proceed to consider the arguments presented.

**B.** *Operating Capital Loans*

■ Defendant concedes that the original working capital loans were subsidies but argues that its decision to expense the benefits of the working capital loans at issue herein in the year of receipt, 1979, and not in the year of investigation, 1981, is fully consistent with prior expressions of its methodology concerning the allocation of benefits of short-term loans. *Defendant's Opposition* at 7, 10. The Court agrees.

As a general proposition, since a loan has a readily identifiable effect on the recipient over time, Commerce allocates loan benefits over the life of the loan. *Subsidies Appendix, Cold-Rolled Carbon Steel Flat-Rolled Products From Argentina*, 49 Fed. Reg. 18,016, 18,019 (Dep't Comm.1984). With respect to short-term loans which are to be "received and repaid within a year, [the ITA] allocate[s] any benefits to one year only." *Id.* at 18,020.[9] The ITA determined that the benefits from the subject short-term loans, consistent with its treatment of such loans in general, should be fully recognized in the year of receipt. Plaintiffs have not challenged Commerce's stated methodology nor demonstrated that its application here distorts the economic reality of the transaction. *See British Steel Corp. v. United States*, 10 CIT ——, ——, 632 F.Supp. 59, 69–70 (1986) (citing *Michelin Tire Corp. v. United States*, 6 CIT 320, 321 (1983), *vacated as moot based on submission of statement of agreed facts*, 9 CIT 38, Slip. Op. 85–11 (Jan. 28, 1985)) (subsidy should be expensed in a

---

**7.** Additionally, it works no perversion on the English language to interpret the twelve days taken by plaintiffs to comment on the report as within the ambit of their request to extend the deadline for the submission of post-hearing briefs by a "period of approximately ten (10) days," A.R. at 1102, after the release of the verification report.

**8.** The Court does not view the telephone call to plaintiffs' counsel, *see infra* at n. 2, as establishing any deadline.

**9.** This accords with a prior methodological statement by the agency:

We continue to believe that benefits of loans are most appropriately allocated over the life of the loan. Unlike grants, loans reflect the period of time in which the company has undertaken to repay the principal plus interest. Therefore, we will allocate loan benefits over the life of the loan, even for loans given expressly to purchase costly capital equipment.

Appendix II, *Certain Carbon Steel Products from Mexico*, 49 Fed.Reg. 5148, 5150 (Dep't Comm. 1984).

manner that provides a basic correspondence between subsidy and benefit).

The parties have directed this Court to the decision in *British Steel Corp. v. United States*, 9 CIT 85, 605 F.Supp. 286 (1985). To the extent that *British Steel* may be relevant at all, the Court perceives no conflict with the instant decision. The *British Steel* court held that subsidies, in the form of equity infusions, that are used to acquire capital assets, may be countervailed after those assets have been prematurely retired. *British Steel*, 9 CIT at ——, 605 F.Supp. at 296.[10] That court agreed with the ITA's position that "the competitive benefit of funds used to acquire assets" may continue beyond the period of actual use of those assets. *Id.* In contrast, the operating capital loans at issue herein did not have long-term effects and were expensed in the year of receipt. The ITA's positions in both the investigation reviewed in *British Steel* and in the instant investigation are consistent with its methodology.

Plaintiffs stress that upon Olarra's declaration of bankruptcy in 1979, it ceased to make payments on its loan obligations, *Plaintiffs' Reply* at 5, at least until formal adoption of the receivership plan. This does not dictate that Commerce alter its methodology in the instant case. Furthermore, the Court rejects the notion that the benefits conferred in the instant case by bankruptcy—extended repayment of principal without interest—may be countervailed.

■ The parties' contentions on this issue involve the "general availability" test. According to defendant, the general avail-

ability of the bankruptcy process to Spanish firms renders its benefits noncountervailable. *Defendant's Opposition* at 17. Recently, the court in *PPG Indus. v. United States*, 11 CIT ——, ——, 662 F.Supp. 258, 264–66 (1987), carefully considered the doctrine of general availability and concluded:

> Although general availability may be a manifestation that a program has not conferred a benefit upon a specific recipient, general availability is not the statutory test. It is merely one of several relevant factors to be considered in determining whether or not a benefit or competitive advantage has been conferred upon a "specific enterprise or industry, or group of enterprises or industries." *See* § 1677(5).

*PPG Indus.*, 11 CIT at —— – ——, 662 F.Supp. at 265–66.[11] Applying the statutory standard, this Court believes that the benefits conferred on Olarra in the instant case by virtue of reorganization do not represent a subsidy. Bankruptcy laws, like tax laws, *see Bethlehem Steel Corp. v. United States*, 7 CIT 339, 348, 590 F.Supp. 1237, 1245 (1984), do not confer countervailable benefits so long as, in their actual operation, they do not "result in special bestowals upon specific enterprises." *Cabot Corp. v. United States*, 9 CIT 489, ——, 620 F.Supp. 722, 732 (1985), *appeal dismissed on motion of appellee*, 788 F.2d 1539, 1540 (Fed.Cir.1986).

The ITA verified that the bankruptcy was in accordance with Spanish law and that the receivership plan was approved by

---

**10.** In a later decision, *British Steel Corp.*, 10 CIT at ——, 632 F.Supp. at 70–71, the court determined that it was unreasonable to allocate the benefits of subsidies, not used to acquire long-lived assets, over a 15 year period (the average useful life of integrated steel-producing assets as determined by the United States Internal Revenue Service).

**11.** 19 U.S.C. § 1677(5) (1982) defines subsidy in pertinent part as follows:

The term "subsidy" ... includes, but is not limited to, the following:

 . . . .

**(B)** The following domestic subsidies, if provided or required by government action to a specific enterprise or industry, or group of en-

terprises or industries, whether publicly or privately owned, and whether paid or bestowed directly or indirectly on the manufacture, production, or export of any class or kind of merchandise:

 **(i)** The provision of capital, loans, or loan guarantees on terms inconsistent with commercial considerations.

 **(ii)** The provision of goods or services at preferential rates.

 **(iii)** The grant of funds or forgiveness of debt to cover operating losses sustained by a specific industry.

 **(iv)** The assumption of any costs or expenses of manufacture, production, or distribution.

at least three-quarters of Olarra's creditors and the Spanish court. Moreover, it is not required, and may be inappropriate, for the ITA to "look behind" the actions of the Spanish tribunal in the absence of facts tending to establish the existence of "a discrete class of beneficiaries," *PPG Indus.*, 11 CIT at ——, 662 F.Supp. at 266, to whom benefits accrue. There is nothing to suggest that the bankruptcy provisions, designed to assist financially troubled debtors, operate in practice to benefit specific enterprises or industries. The mere fact that bankruptcy allows repayment of debt on favorable terms—which is the essence of giving debtors a "fresh start"—does nothing to establish that only specific recipients have access to its benefits.

In sum, based on the record with regard to the treatment of working capital loans and the benefits flowing from Olarra's declaration of bankruptcy, the Court is satisfied that the ITA's position is "sufficiently reasonable," *American Lamb Co. v. United States*, 785 F.2d 994, 1001 (Fed.Cir.1986) (quoting *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 39, 102 S.Ct. 38, 46, 70 L.Ed.2d 23 (1981)), and that substantial evidence exists for its conclusion. *See also Asahi Chem. Indus. v. United States*, 4 CIT 120, 123, 548 F.Supp. 1261, 1264 (1982) (methodology need not be the most reasonable one available nor the one that the court would have selected). Under the appropriate standard of review, this is all that is required of the agency.

C. *Equity Investments by the Bank of Spain*

■ Plaintiffs present the following concerns with respect to the Bank of Spain's purchases of shares of Olarra's stock:

(a) that such purchases may operate as an implied guarantee by the Spanish government allowing Olarra to obtain preferential commercial loans;

(b) that the presence of the Bank of Spain might enable and encourage the company to provide returns to its shareholders which are lower than would otherwise be acceptable;

(c) that such purchases may have occurred at a time when dividends were in arrears thus allowing Olarra to avoid its preferred stock obligations;

(d) that if the market possessed information concerning the Bank of Spain's plans to acquire stock prior to Olarra's issuance of stock in 1976, the price paid by private investors directly to the company for the stock would be greater than it otherwise would be. If so, the benefits of the purchases would then flow to Olarra, even if made several years after the 1976 stock issuance.

*Plaintiffs' Motion* at 17–18.

The ITA's final determination makes no mention of the information uncovered upon verification concerning the aforementioned stock purchases. Notwithstanding the efforts of defendant's counsel to explain for purposes of the instant appeal why such purchases cannot amount to a countervailable subsidy, the Court holds that it was error for the ITA not to explain, assuming it so concluded, its rationale for rejecting the possibility that the stock purchases in the instant case conferred a subsidy on Olarra.

In so holding, the Court seeks to affirm its dedication to the tenet that "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943). This Court will judge "the propriety of [the administrative] action solely by the grounds invoked by the agency," *SEC v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947), and not by "counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)); *Maine Potato Council v. United States*, 9 CIT 293, ——, 613 F.Supp. 1237, 1245 (1985) (counsel's explanation inadequate substitute for clear statement from agency concerning

treatment of information). The Court is aware that a "decision of less than ideal clarity [can be upheld] if the agency's path may reasonably be discerned." *Ceramica Regiomontana, S.A. v. United States*, 810 F.2d 1137, 1139 (Fed.Cir.1987) (per curiam) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). The ITA's proferred explanations for its determinations as to the other issues raised in this appeal are adequate, albeit less than ideal, to illuminate the agency's decision-making path. In contrast, the ITA's complete failure to address the stock purchase question, which was raised by plaintiffs during the administrative proceedings, is not in accordance with law, and requires a remand to the agency to allow further consideration of the issue. *See Portable Elec. Typewriters from Japan*, 40 Fed.Reg. 27,-079 (Int'l Trade Comm'n 1975) (final neg. injury determination), *remanded sub nom.*, *SCM Corp. v. United States*, 84 Cust.Ct. 227, 243, C.R.D. 80–2, 487 F.Supp. 96, 108 (1980), *remanded*, 2 CIT 1, 7, 519 F.Supp. 911, 915–16 (1981), *decision on remand aff'd*, 4 CIT 7, 16–17, 544 F.Supp. 194, 201–02 (1982) (action remanded twice for agency to provide a more specific and explicit statement of its determinations); *Budd Co., Ry. Div. v. United States*, 1 CIT 67, 76, 507 F.Supp. 997, 1004 (1980) (action remanded where basis of agency's findings of fact unclear and no statement of reasoning offered for resulting determination).

### Conclusion

This action is remanded to the ITA to allow it to consider and explain fully whether the stock purchases by the Bank of Spain amount to a countervailable subsidy. The ITA's determinations with regard to the other issues raised for the purposes of this appeal are affirmed. The agency is directed to submit the results of its decision on remand within thirty days from the date of this order. Plaintiffs will then have fifteen days to respond and defendant may reply within ten days thereafter.