HOLMES PRODUCTS CORP., PLAINTIFF *v.* UNITED STATES AND U.S. INTERNATIONAL TRADE COMMISSION, DEFENDANTS

Court No. 92-01-00013

(Decided December 30, 1992)

*Dickstein, Shapiro & Morin* (*Arthur J. LaFave III, Douglas N. Jacobsen*), for plaintiff.
*Lyn M. Schlitt,* General Counsel, United States International Trade Commission, *James A. Toupin,* Assistant General Counsel (*Judith M. Czako*), for defendants.

OPINION

RESTANI, *Judge:* Plaintiff, Holmes Products Corporation ("Holmes"), challenges the final affirmative injury determination by the International Trade Commission ("ITC") in the antidumping duty investigation of oscillating fans from the People's Republic of China ("PRC"). *See Certain Electric Fans from the People's Republic of China,* Inv. No. 731–TA–473 (Final), USITC Pub. 2461 (Brunsdale, Acting Chair, dissenting) (*"Final Det."*); 56 Fed. Reg. 64,642 (ITC 1991). The case is remanded to ITC for further explanation of the evidence of the nexus between imports and injury.

I. BACKGROUND

Holmes is a United States corporation that sells electric oscillating fans in the United States. Most of Holmes' fans are manufactured in the PRC by Esteem Industries, Ltd. ("Esteem"), a Hong Kong company with a factory in southern China.

On October 31, 1990, Lasko Metal Products, Inc. ("Lasko") filed an antidumping duty petition with the International Trade Administration of the United States Department of Commerce ("ITA" or "Commerce") and ITC. The petition alleged that certain electric oscillating and ceiling fans from the PRC were being dumped in the United States at less than fair value ("LTFV"), and were causing material injury to a United States industry.

On October 18, 1991, Commerce announced its final antidumping duty determination. It found that oscillating and ceiling fans were separate classes or kinds of merchandise, and published dumping margins as to each. After correction of errors, the final dumping margins for the four producers investigated were de minimis for three producers (Wuxi

Electric Fan Factory, Durable Electrical Metal Factory Ltd. and Polaray Industrial Corporation), and 0.79 percent for Holmes/Esteem. *Oscillating Fans and Ceiling Fans From the People's Republic of China,* 56 Fed. Reg. 64,240 (Dep't Comm. 1991) (antidumping duty orders and amendments to final determinations); *Oscillating Fans and Ceiling Fans from the People's Republic of China,* 56 Fed. Reg. 55,271, 55,282–83 (Dep't Comm. 1991) (final determinations of LTFV sales).

On December 2, 1991, ITC issued its final determination. A majority found that United States industries were materially injured by reason of LTFV imports of oscillating and ceiling fans from the PRC. *Final Det.,* at 20. Holmes filed this action, challenging the determination concerning oscillating fans. The determination concerning ceiling fans was the subject of a separate action. *Encon Indus., Inc. v. United States,* 16 CIT 840, Slip Op. 92–164 (Sept. 24, 1992).

## II. ITC'S FINAL DETERMINATION

ITC first defined the domestic like product and the domestic industry. As in the preliminary determination, it found two domestic like products, oscillating fans and ceiling fans. *See Final Det.,* at 6. In a change from the preliminary determination, however, ITC found that the essential characteristic of oscillating fans is "oscillation and the consequent ability to provide a multi-directional cooling air flow and air circulation." *Final Det.,* at 12. Thus, window, box, and other household fans, which do not oscillate, were excluded from the oscillating fan like product. *See Final Det.,* at 11–12.

ITC then examined the condition of the domestic industry during the period of investigation and interim periods, and found material injury.

Finally, ITC considered whether material injury to the domestic industry occurred "by reason of" LTFV imports. ITC found that LTFV imports have captured a significant and increasing share of the U.S. market. *Final Det.,* at 20. The price information was confidential, and ITC discussed it only in general terms. ITC noted mixed pricing trends, and found that pricing information supports an affirmative determination because "price is the most important factor in deciding between imported and domestically produced oscillating fans." *See Final Det.,* at 19. ITC concluded that LTFV imports of oscillating fans are a cause of material injury to the domestic producers of the like product. *Final Det.,* at 20.

## III. STANDARD OF REVIEW

ITC's determination will be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988).

## IV. DISCUSSION

### 1. *Nonsubject Firms and Merchandise:*

To determine whether material injury has occurred by reason of the LTFV imports under investigation, ITC considers the volume of im-

ports, their effect on domestic prices and production, and other relevant factors. 19 U.S.C. § 1677(7) (1988). Holmes claims error because some of the data on which ITC relied pertained to firms and merchandise that were not subject to investigation. The government responds that Holmes has waived these arguments.

a. *Waiver:*

Holmes makes three arguments, which the government claims have been waived. Holmes claims ITC erred in the following respects: first, it considered imports from manufacturers not investigated by Commerce; second, it relied on the official import statistics, which included nonsubject merchandise; and third, it considered pricing and lost sales information pertaining to excluded firms. Holmes claims that it raised each of these issues before ITC. The record, however, indicates that only the third argument was clearly raised.

In its prehearing brief, Holmes argued that ITC should not consider imports produced by companies excluded from ITA's determination of LTFV sales. *Holmes' Prehearing Brief,* at 12–13, Administrative Record, List 2, Confidential Document ("C.R.") 17.[1] Holmes did not raise arguments about noninvestigated firms or nonsubject merchandise. Holmes claims these arguments were implicitly raised by an exhibit attached to its prehearing brief, in which it computed import volume based on data from firms actually investigated and found to be selling at LTFV. This exhibit, however, is insufficient to alert ITC to Holmes' arguments. Thus, it appears that Holmes did not raise, either explicitly or implicitly, the first and second arguments made here.

To avoid waiver, Holmes claims that its first argument presents an issue of law, which may be considered for the first time on review by this court. It also claims that failure to raise its second argument is excused because ITC actually considered the issue.

When a party who participated in the administrative proceeding asserts a new claim that is purely legal, the court has discretion to consider it. *Hercules, Inc. v. United States,* 11 CIT 710, 735, 673 F. Supp. 454, 476 (1987); *see Rhone Poulenc, S.A. v. United States,* 7 CIT 133, 136, 583 F. Supp. 607, 611 (1984). The court must take into account any prejudice that may result from failure to raise the issue at the administrative level. *Hercules,* 11 CIT at 735, 673 F. Supp. at 476. Holmes' first argument—that ITC may not consider effects on the domestic industry of imports from firms that were not investigated—presents an issue of law. Nevertheless, as Holmes offers no compelling reason for failure to raise the argument before ITC, and as the government would undoubtedly suffer prejudice if the argument were considered for the first time in this forum, the court finds that Holmes' first argument is waived.

---

[1] At the time Holmes filed its prehearing brief, ITA had excluded only Durable and Polaray from the investigation; Wuxi was excluded at a later date.

A party may be excused from failure to raise an argument before the administrative agency as long as the agency in fact considered the issue. *See Washington Assoc. for Television and Children v. F.C.C.,* 712 F.2d 677, 682 (D.C. Cir. 1983); *see Al Tech Specialty Steel Corp. v. United States,* 11 CIT 372, 377 n.5, 661 F. Supp. 1206, 1210 n.5 (1987) (dicta). Thus, exhaustion may be excused if the issue was raised by another party, or if it is clear that the agency had an opportunity to consider it. *See Washington Assoc.,* 712 F.2d at 682 n.10; *Office of Communication of United Church of Christ v. F.C.C.,* 465 F.2d 519, 523 (D.C. Cir. 1972). Holmes claims the agency staff itself raised the issue of nonsubject merchandise.[2] The ITC staff was aware that the official import statistics included nonsubject merchandise, and could be overstated. Final Staff Report at A–87, C.R. 28; Hearing Transcript at 63, Administrative Record, Public Document 200. Nevertheless, the staff chose to rely on the statistics, finding them more reliable than the questionnaire responses. Final Staff Report at A–87, C.R. 28. None of the parties made any objection. To assume ITC treated this as a serious issue, in the absence of objections, goes too far. ITC's determination does not reflect any controversy on the issue. In summary, only Holmes' third argument will be considered here; its first and second arguments have been waived.

b. *Effect of Imports on Domestic Prices and Production:*

Holmes argues that ITC failed to exclude from its determination evidence of prices charged by two excluded firms, and sales lost to these firms. The government concedes that the price tables contained data pertaining to two excluded firms. It argues, however, that the error was harmless because, even without this data, the trends of mixed underselling and overselling do not change. With respect to the lost sales data, the government does not specifically concede or deny error, but argues that ITC did not rely on lost sales.

ITC did not find evidence of price depression or suppression, nor did it find confirmed lost sales. The only evidence it found of the nexus between imports and injury to the domestic industry was "mixed overselling and underselling." Although ITC need not find a consistent pattern of underselling to make an affirmative determination (*see Florex v. United States,* 13 CIT 28, 40, 705 F. Supp. 582, 593 (1989)), it must demonstrate that, under the circumstances, mixed trends are adequate to establish causation. In this case, the pricing information was confidential, and ITC discussed it only in the most general terms. Now, because ITC has disclosed so little of its reasoning on price effects, the court is not in a position to review that aspect of the determination. The case is, therefore, remanded so that ITC may give a further explanation of its determination on causation; if ITC finds itself constrained by the confidential nature of the price information, it should issue a confidential de-

---

[2] Holmes also claims Lasko raised the issue in its prehearing and posthearing briefs. It does not appear, however, that the issues were raised by the briefs. *See* Petitioner's Prehearing Brief, at 22, C.R. 14; Petitioner's Posthearing Brief, C.R. 23.

cision. On remand, ITC will eliminate price and lost sales data pertaining to excluded firms.

2. *Other Factors, Impact of the Dumping Margin, and Like Product:*

Holmes argues that the domestic industry was injured not by LTFV imports from the PRC, but by other factors such as decreasing U.S. demand, and declining labor productivity and capacity utilization. Holmes also argues that PRC imports were not a cause of injury because they merely replaced imports from other countries. As the government correctly points out, Holmes is offering alternative interpretations of the evidence in the record, but ITC is not to weigh the various causes of injury. A cause that contributes to material injury, even minimally, is sufficient. *Encon,* 16 CIT at 841, Slip Op. 92–164, at 5 (citations omitted). If on remand ITC finds that PRC imports caused injury and substantial evidence supports the finding, the determination will be sustained.

Holmes argues that the ITC majority erred by disregarding the negligible price impact of the dumping margin. Holmes concedes that ITC is not required to consider the dumping margin. Holmes argues, however, that the rule is a "prescription for * * * arbitrary and capricious" decision making. *Holmes' Brief,* at 32. The case law on this point is clear. ITC has *discretion* to consider the dumping margin; no cases *require* consideration of the margin, even when it is extremely low. *See Hyundai Pipe Co., Ltd. v. U.S. Int'l Trade Comm'n.,* 11 CIT 117, 121, 670 F. Supp. 357, 360 (1987).

Finally, Holmes argues that ITC erred in excluding non-oscillating fans (floor, window, wall and box fans) from the domestic like product. Holmes claims these fans differ only in minor respects from oscillating fans. ITC's determination of the like product rested on its finding that the essential characteristic of oscillating fans was their ability to oscillate and cool air in many directions. This finding is supported by substantial evidence, and will not be disturbed.

## V. CONCLUSION

The case is remanded to ITC to set forth its reasoning concerning causation with greater specificity, and to exclude price and lost sales data for firms that were excluded from ITA's determination.