**MITSUBISHI HEAVY INDUSTRIES, LTD., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**Goss Graphics, Inc., Defendant–Intervenor.**

**Slip Op. 98–82.**
**Court No. 96–10–02292.**

United States Court of International Trade.

June 23, 1998.

Steptoe & Johnson, Washington, DC (Anthony J. LaRocca, Carol A. Mitchell, Eric C. Emerson, Duncan B. Hollis and Richard O. Cunningham); Gibson Dunn & Crutcher LLP, Washington, DC (Daniel J. Plaine) Attorneys for Mitsubishi Heavy Industries, Ltd.; Perkins Coie LLP, Washington, DC (Yoshihiro Saito and Mark T. Wasden), for Tokyo Kikai Seisakusho, Ltd., for Plaintiffs.

Frank W. Hunger, Assistant Attorney General of the United States, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice; Of Counsel, Robert J. Heilferty, Attorney, Office of the Chief Counsel for Import Administration, Department of Commerce, and Randi–Sue Rimerman, Attorney, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendants.

Wiley, Rein & Fielding, Washington, DC (Charles Owen Verrill, Jr., Alan H. Price, and Willis S. Martyn III), for Defendant–Intervenors.

## OPINION

POGUE, Judge:

Plaintiffs Mitsubishi Heavy Industries, Ltd. ("MHI") and Tokyo Kikai Seisakusho, Ltd. ("TKS"), respondents in the underlying investigation, and Plaintiff Goss Graphic Systems, Inc. ("Goss"), petitioner in the underlying investigation, filed separate motions challenging various aspects of the final determination of the International Trade Administration of the United States Department of Commerce ("Commerce" or "ITA") regarding imports of large newspaper printing presses ("LNPPs") from Japan. *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan,* 61 Fed.Reg. 38,139 (Dep't Commerce 1996) (final det.)("Japan Final"), as amended by *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan,* 61 Fed.Reg. 46,621 (Dep't Commerce

1996) (antidumping duty ord. and amendment to final det.). The motions were consolidated.

The antidumping investigation of LNPPs from Japan was conducted simultaneously with Commerce's investigation of sales of LNPPs from Germany. Issues common to both investigations were discussed in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Germany*, 61 Fed.Reg. 38,166 (Dep't Commerce 1996) (final det.) ("Germany Final"). The Court affirmed Commerce's determinations with respect to common issues of scope and standing. *Mitsubishi Heavy Indus. Ltd. v. United States*, 21 CIT ——, 986 F.Supp. 1428 (1997). Familiarity with the Court's opinion on scope and standing issues is assumed.

## DISCUSSION

### I. CONSTRUCTED EXPORT PRICE

In calculating a dumping margin, Commerce compares United States price to the normal value of the subject merchandise. United States price is calculated using either an export price ("EP") methodology or a constructed export price ("CEP") methodology.[1] Typically, Commerce relies on EP when the foreign exporter sells directly to an unrelated U.S. purchaser. CEP is used when the foreign exporter makes sales through a related party in the United States. *See Sharp Corp. v. United States*, 63 F.3d 1092, 1093–94 (Fed.Cir.1995) ("The statute defines [U.S. price], ... as either the United States purchase price [now EP] or the exporter's sales price [now CEP], whichever is appropriate.... Commerce uses the [CEP] if the foreign manufacturer imports through a related company in the United States.") (citations omitted).

For each of the relevant LNPP sales by MHI and TKS to the United States, Commerce calculated U.S. price based on a CEP methodology. TKS had reported its sales as CEP sales and therefore does not object to

Commerce's methodology. However, MHI reported its sales as EP sales. MHI objects to Commerce's decision to reclassify all of its sales as CEP sales. MHI also objects to Commerce's decision to treat its installation costs as further manufacturing, Commerce's methodology for allocating general and administrative ("G & A") expenses for MHI's U.S. subsidiary, and Commerce's decision to deduct from U.S. price, indirect selling expenses incurred in Japan. Both TKS and MHI object to Commerce's refusal to grant a level-of-trade ("LOT") adjustment or CEP offset.

### 1. Commerce's Decision to Base MHI's U.S. Price on CEP

■ The antidumping statute defines EP as follows:

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States....

19 U.S.C. § 1677a(a) (1994). Constructed export price is defined as follows:

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter....

19 U.S.C. § 1677a(b).

When U.S. price is based on CEP, Commerce bases its calculations on the price charged to the first unaffiliated purchaser. This is the starting price. Commerce then makes certain adjustments including several that are not required for EP sales. The CEP adjustments "are made for certain amounts associated with the sale of merchan-

1. Prior to the Uruguay Round Agreements Act, EP sales were designated purchase price sales, while CEP sales were designated as exporter's sales price sales. "Notwithstanding the change in terminology, no change [was] intended in the circumstances under which export price versus constructed export price are to be used." H.R.Rep. No. 103–826(I) at 79 (1994), *reprinted in* 1994 U.S.C.C.A.N. 3773, 3851.

dise in the United States, typically, commissions for selling the merchandise ... and sales expenses generally incurred in selling the same type of merchandise in the United States." *PQ Corp. v. United States,* 11 CIT 53, 59, 652 F.Supp. 724, 730 (1987). The purpose of these adjustments is to prevent foreign producers from competing unfairly in the United States market "by spending amounts on marketing and selling their products that are in excess of what they spend in their home markets." *Id.* According to the Statement of Administrative Action to the URAA,[2] "constructed export price is ... calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers." H.R. Doc. No. 103–316 at 823 (1994) ("SAA").

The statute does not specify the circumstances under which Commerce is to choose EP or CEP. However, according to the SAA,

[i]f the first sale to an unaffiliated purchaser in the United States, or to an unaffiliated purchaser for export to the United States, is made by the producer or exporter in the home market prior to the date of importation, then Commerce will base its calculation on export price. If, before or after the time of importation, the first sale to an unaffiliated person is made by (or for the account of) the producer or exporter or by a seller in the United States who is affiliated with the producer or exporter, then Commerce will base its calculation on constructed export price....

*Id.* at 822–23.

Thus, a sale to an unaffiliated party made prior to importation and involving an importer affiliated with the producer or exporter could be either an EP or a CEP sale. In such a situation, "the determination of whether [EP] or [CEP] applies must be based upon additional circumstances." *PQ Corp.* at 60, 652 F.Supp. at 731. In *Certain*

*Stainless Steel Wire Rods from France,* 58 Fed.Reg. 68,865 (Dep't Commerce 1993) (final det.), Commerce described the additional criteria it examines in deciding whether to use an EP or CEP methodology as follows:

The first criterion is that the merchandise in question is shipped directly from the manufacturer to the unrelated buyer, without being introduced into the inventory of the related selling agent. The second criterion is that this arrangement is the customary commercial channel for sales of this merchandise between the parties involved....

The third criterion is that the related selling agent located in the United States acts only as a processor of sales-related documentation and a communication link with the unrelated U.S. buyer.

*Id.* at 68,868–69. Commerce will apply the EP methodology only if all three criteria apply to the sales at issue. *Id.* This test has been approved by this court. *See Independent Radionic Workers v. United States,* 19 CIT 375, 375 (1995)(describing Commerce's three criteria as "the judicially approved test").

At oral argument, counsel for MHI argued that Commerce's three-part test is incomplete because it does not focus on the key statutory distinction between EP and CEP.

The statute describes EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise *outside of the United States* to an unaffiliated purchaser in the United States...." 19 U.S.C. § 1677a(a)(emphasis added). CEP is described as "the price at which the subject merchandise is first sold (or agreed to be sold) *in the United States* ...." 19 U.S.C.

---

**2.** The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements...." SAA at 656. "It is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." *Id.* (quoted in *Delverde, SrL v. United States,* 21 CIT ——, 989 F.Supp. 218, 230 n. 18

(1997). *See also* 19 U.S.C. § 3512(d)(1994) ("The statement of administrative action approved by the Congress ... shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.")

§ 1677a(b)(emphasis added). The inside/outside distinction between the two sections is critical, counsel argued, and therefore, Commerce's analysis must focus on the nature of the activities performed by MHI's U.S. subsidiary to determine whether the sales at issue occurred in the United States or in Japan.

Commerce's three-part test was created before the enactment of the URAA. Under the pre-URAA version of the statute, purchase price (now EP) was described as follows: "the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States." 19 U.S.C. § 1677a(b) (1988). Exporter's sales price (now CEP) was described as, "the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter...." 19 U.S.C. § 1677a(c) (1988). In distinguishing between purchase price and exporter's sales price sales, courts focused on the relationship between the foreign exporter and the importer rather than the date of sale. *See Smith–Corona Group v. United States*, 1 Fed. Cir. (T) 130, 132–33, 713 F.2d 1568, 1572 (1983) ("Where the importer is an unrelated, independent party, purchase price is used.... Where the importer is related, an arm's length transaction does not occur until the goods are resold to a retailer or to the public. In that case, 'exporter's sales price' is used."). Commerce refined that distinction deciding that in cases in which all the criteria in its three-part test were met, a sale through a related U.S. importer would be considered a purchase price transaction. *See E.I. DuPont de Nemours & Co. v. United States*, 17 CIT 1266, 1281, 841 F.Supp. 1237, 1249 (1993) ("[S]ales to a related importer in the United States are usually exporter's sales price transactions. However, ... when a sale to a related importer meets the additional criteria ... it will be treated as a purchase price transaction.").

The purchase price and exporter's sales price provisions were changed by the URAA. The change most relevant to this issue, was the addition of the phrase, "outside of the United States," to the definition of EP (purchase price). However, that phrase follows the words, "by the producer or exporter of the subject merchandise." Therefore, it is not clear whether the phrase is meant to describe the location of the sale, or the location of the producer or exporter. Thus, the Court finds that the meaning of the phrase "outside of the United States," is ambiguous.

In the face of this ambiguity, the Court will defer to Commerce's interpretation if that interpretation is reasonable. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ("[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed.Cir.1994) ("[A] court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another."). In determining whether Commerce's interpretation is reasonable, the Court considers, among other factors, the express terms of the provisions at issue, the objectives of those provisions and the objectives of the antidumping scheme as a whole. In this case, the change in the language is also a significant factor. However, the implications of that change are not clear enough to convince the Court that Commerce's interpretation was unreasonable.

While the change in language may weigh against Commerce's interpretation of the U.S. price provisions other factors support Commerce's interpretation. The test Commerce relied on is longstanding and has been approved by this court. *Independent Radionic Workers*, 19 CIT at 375. Furthermore, the test reflects the courts' understanding that the key distinction between EP and CEP is the relationship between the exporter and the importer. Specifically, the three-part test eliminates from the CEP category those sales in which the role of the related U.S. importer is so minor, that the sales are, in reality, transactions between the foreign exporter and the unrelated U.S. purchaser. Finally, Commerce's decision to con-

tinue to rely on the three-part test is supported by the SAA, which states that "no change is intended in the circumstances under which export price (formerly 'purchase price') versus constructed export price (formerly 'exporters sales price') are used." SAA at 822–23. Here Commerce relied on a longstanding, judicially approved test that is consistent with the express terms of the statute. Commerce's interpretation of the statute was also supported by the SAA. Thus, Commerce's actions were in accordance with law.

■ Commerce applied its three-part test, relying on the third criterion in its decision to base U.S. price on CEP.

[W]e reclassified all MHI sales as CEP/FM sales because MHI's affiliated U.S. sales agent acted as more than a processor of sales-related documentation and a communication link with the unaffiliated U.S. customers. The U.S. affiliate engaged in a broad range of activities including purchasing parts, warranty, technical services, and the coordination of installation, which we have classified as further manufacturing.

Japan Final, 61 Fed.Reg. at 38,141.

MHI argues that the activities undertaken by its U.S. affiliate could not justify Commerce's decision to rely on CEP rather than EP. "[The statute] contemplates using CEP not where U.S. selling activities are extensive but where an affiliate's selling activities *exceed* or *displace* those 'routine selling functions' an exporter would employ to make a direct sale." Brief Pl. MHI Reply Def.'s and Goss Graphic Systems, Inc.'s Response Briefs Comp. and Country–Specific Issues at 1 ("MHI Reply Brief") (citing *E.I. DuPont de Nemours & Co. v. United States,* 17 CIT 1266, 1282, 841 F.Supp. 1237, 1250 (1993)) (other citations omitted).

However, as Commerce explained, where all the criteria in the three-part test are met,

the Department has regarded the routine selling functions of the exporter as "merely having been relocated geographically from the country of exportation to the United States,".... [W]here the functions are performed "does not change the substance of the transactions or the functions themselves."

Germany Final at 38,175 (citing *Certain Internal–Combustion, Industrial Forklift Trucks from Japan,* 53 Fed.Reg. 12,552 (Dep't Commerce 1988) (final det.)).

In this case, Commerce stated, "we believe that the various activities of MHI's subsidiary MLP were substantially more than 'routine selling functions.'" Germany Final at 38,176. Specifically, Commerce said, MLP was involved in the following areas: selling agency, after-sales servicing, sourcing of non-subject parts, and supervision of installation. "As MHI's principal sales agent in the United States, MLP was directly responsible for identification of Piedmont as a buyer, and cooperated with Sumitomo in the delegation of oversight for the Guard sale." *Id.* MLP also incurred warranty expenses for at least one sale and supervised installation through the work of its engineers for both sales.

Commerce has provided substantial evidence demonstrating that MLP did in fact carry out the activities listed. MHI's response to Commerce's supplemental questionnaire of Dec. 8, 1995 describes MLP's activities as follows:

*Piedmont:* MLP identified the customer and served as a communications link between the customer and MHI. MLP was importer of record for this sale. MLP provided two engineers during installation of the press who assisted the MHI installation supervisors. MLP arranged for the purchase of the U.S. auxiliary parts required by the contract under the instruction and supervision of MHI. MLP personnel provided some of the technical services required by the Piedmont contract....

*Guard:* .... MLP was responsible for arranging for the installation of the press, and supplied two engineers to assist the MHI installation supervisors in the installation of the press. MLP arranged for the purchase of the U.S. auxiliary parts required by the contract under the instruction and supervision of MHI. MLP personnel provided warranty assistance....

Response of Mitsubishi Heavy Industries, Ltd. to Dec. 8, 1995 Antidumping Supp. QR., Jan. 18, 1996 (N–P Doc. 115) at A–36. These

activities went beyond the provision of "sales-related documentation" and communications with U.S. customers. They are, therefore, in excess of the routine selling functions an exporter would employ to make a direct sale. Thus, the Court finds Commerce appropriately treated MHI's sales as CEP sales.

2. *Further Manufacturing by MHI*

█ In calculating MHI's U.S. price, Commerce treated MHI's installation of the subject merchandise as part of further manufacturing "because the U.S. installation process involves extensive technical activities on the part of engineers and installation supervisors and the integration of subject and integral, non-subject merchandise necessary for the operation of LNPPs." Germany Final at 38,177. According to the statute, CEP is to be reduced by, "the cost of any further manufacture or assembly (including additional material and labor) ..." 19 U.S.C. § 1677a(d)(2).

MHI maintains that installation expenses should have been treated as movement-related expenses, pursuant to 19 U.S.C. § 1677a(c)(2)(A), which requires Commerce to reduce EP and CEP by "the amount, if any, included in such price, attributable to any additional costs, charges, or expenses ... which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States...."

The distinction is significant because Commerce calculates movement-related expenses without imputed profit. Further manufacturing costs, on the other hand, include an imputed profit attributable to the value added by the further manufacturing activities. *See* Mem. Pl. Mitsubishi Heavy Industries, Ltd. Support Mot. J. Agency R. Comp.–Specific Issues at 13 ("MHI brief").

MHI argues that prior to the URAA, the statute only permitted Commerce to deduct "any increased value, including additional material and labor, resulting from a process of manufacture or assembly performed on the imported merchandise *after the importation of the merchandise and before its sale* ...." *Id.* (citing 19 U.S.C. § 1677a(e)(3) (1988)). The current statute does not specify

a time period within which the further manufacture or assembly must take place. However, MHI argues, "Congress made it clear, ... that the new provision 'is not intended to effect any substantive change in the deduction made under the current statute for value added from processing or assembly in the United States'...." MHI Brief at 13–14 (quoting the SAA at 824). Because the assembly activities at issue here took place after the sale, MHI argues, they cannot be deducted as further manufacturing.

The Court does not agree. As MHI recognizes, the statute governing the instant investigation does not include any temporal restriction in the definition of further manufacturing. Furthermore, even before the URAA took effect, Commerce treated activities occurring after the relevant sales as further manufacturing in certain cases. For example, in *Certain Small Business Telephone Systems and Subassemblies Thereof from Korea*, 54 Fed.Reg. 53,141, 53,151 (Dep't Commerce 1989)(final det.)("*SBTS*") the respondent argued specifically that installation occurred after the sale and therefore, could not be considered as value added. Commerce disagreed, explaining, "[w]hether this value is added before or after the sale is irrelevant because, for this product, [respondent's] customers expect the installed system to have the characteristics added by the non-subject merchandise." *SBTS* at 53, 151. The physical further manufacturing may have occurred after the sale, but the value added by that further manufacturing was reflected in the sale price of the merchandise. For this reason, SBTS was in accordance with the prior statute.

Commerce relied on the same reasoning in this case. " 'Whether ... value is added before or after the sale is irrelevant because, ... customers expect the installed system to have the characteristics added by the non-subject merchandise.' " Germany final at 38,178 (quoting *SBTS* at 53,151.) Commerce's explanation is reasonable. LNPPs are custom made to order. Therefore, MHI's installation activities, including the addition of non-subject merchandise would all be included in the sales price of the LNPP agreed upon prior to importation. Further-

more, Commerce's interpretation of the statute has not changed from its pre-URAA interpretation. Therefore, Commerce's actions were consistent with the interpretation of the statute articulated in the SAA.[3]

MHI also argues that Commerce's decision was inconsistent with well-established agency practice. "[Commerce] has consistently acknowledged in the past that installation expenses incurred due to the need to move large industrial equipment from a manufacturing facility to the customer's site are movement-related expenses and should be treated as such in the dumping calculation." MHI brief at 14–15. Here, MHI asserts, "MHI's undisputed evidence showed that it manufactured LNPP components in Japan, assembled them there, tested them, then disassembled them for shipment to the United States...." *Id.* at 15.

In support of its argument that Commerce typically treats the costs of installing large industrial equipment as movement-related, MHI cites *Mechanical Transfer Presses from Japan,* 55 Fed.Reg. 335 (Dep't Commerce 1990)(final det.). In that case, Commerce treated installation expenses as movement charges, explaining,

> we have determined that these expenses should be treated as movement charges. Due to their large size, it is necessary to disassemble MTPs [mechanical transfer presses] for shipment and delivery to the customer's facilities. Upon delivery to the customer's premises, the presses must be reassembled (installed) in order to function. Because disassembly and reassembly are necessary to deliver the merchandise, we have determined that installation and related supervision expenses are movement charges.

*Id.* at 339.

However, in other cases, particularly those in which assembly included the addition of non-subject merchandise, Commerce has treated assembly costs as further manufacturing. In *Certain Internal–Combustion, Industrial Forklift Trucks from Japan,,* Commerce concluded that operations performed in the United States, including: "(1) Securing of certain options ... to the units for shipment to customers, (2) attachment of lights, alarms, and hydraulic valves, and (3) swapping of [parts]" constituted further manufacture. 53 Fed.Reg. 12,552, 12,565 (Dep't Commerce 1988) (final det.). Similarly, in *SBTS,* Commerce treated the costs of integrating non-subject subassemblies with subject subassemblies and installation as further manufacturing. *See Id.* at 53,150. Based on the determinations cited above, the Court finds that Commerce has not established a consistent practice of treating installation costs as movement-related expenses. In the case now before the Court, Commerce stated,

> the Department has not applied a blanket rule on the treatment of installation expenses, sometimes treating them as assembly costs, a circumstance of sale adjustment or shipment expenses, depending on the particular circumstances involved. Where those circumstances include the incorporation of integral, non-subject components during installation or complex installation operations that are more than mere reassembly, the precedent clearly supports treatment of installation expenses as further manufacturing.

Germany Final at 38,177. Commerce distinguished the instant case from that in *MTPs,* explaining that,

> [i]n the investigation of *MTPs from Japan* ... the Department treated installation expenses as a portion of shipment expenses, because installation consisted primarily of the reassembly of parts originally disassembled at the manufacturers domes-

---

**3.** MHI also argues that "[t]his Court acknowledged that the deduction under section 772(e) was limited by statute to the time period 'after importation and before sale to an unrelated customer.' " MHI brief at 13 (citing *Ad Hoc Comm. of So. Calif. Producers of Gray Portland Cement v. United States,* 914 F.Supp. 535, 541 (1995)). That case is not persuasive on this issue. In that case, the court affirmed Commerce's decision to treat certain transportation costs as further man-

ufacturing costs. The Court found that the transportation costs were "necessarily incurred in a process of manufacture performed on the merchandise ..." and that, "the transportation costs are incurred during the relevant time frame, i.e. after importation and before sale to an unrelated customer." *Id.* It is not clear from the opinion whether the court would have decided the case differently if the activity at issue had occurred after the sale to the unrelated customer.

tic plant. The items added in the United States were accessories which were not integral to the functioning of the press. Preliminary Concurrence Mem. at 14 (N–P Doc. 152). In the case of LNPPs, on the other hand, Commerce found that "the respondents' U.S. subsidiaries' roles in the sale, installation and servicing of LNPPs, and their supervision of the incorporation of integral, non-subject components during installation, constitute a process that is more than mere reassembly."[4] Germany Final at 38,-177.

Commerce's decision was consistent with the statute and did not violate any longstanding agency policy. Therefore, the Court finds Commerce's action to be in accordance with law.

### 3. Allocation of General and Administrative Expenses for MHI

█ In calculating the cost of MHI's further manufacture or assembly in the United States, Commerce allocated a portion of MLP's total general and administrative costs ("G & A") to the cost of installing the LNPPs. Commerce allocated the G & A expenses by calculating MLP's total cost of goods sold ("CGS") for both LNPP and commercial press operations and then allocating the G & A costs to MLP's LNPP installation costs based on the percentage of CGS attributable to MLP's LNPP operations.

Although MHI acknowledges that Commerce usually allocates G & A expenses based on CGS, in this case, MHI argues, Commerce's methodology overstated the amount of MLP's G & A expenses attributable to its LNPP installation. Specifically, MHI argues, it submitted substantial evidence to demonstrate that "[w]hile the resources devoted to the sale of LNPPs are small compared to commercial presses, the relative cost of LNPPs is large, thus distorting any methodology based on CGS." MHI

Brief at 20. For these reasons, MHI maintains, Commerce should have used a headcount methodology to allocate MLP's G & A costs. In other words, MHI is arguing that Commerce should have based its G & A allocation on the relative number of personnel involved in MLP's LNPP operations.

MHI is not arguing that, as a general rule, Commerce's CGS methodology is inconsistent with the statute. The issue here is whether, as a factual matter, Commerce's methodology distorted its calculation of MLP's LNPP installation costs. In addressing factual issues, "[the court's] role is limited to deciding whether the Commission's decision is 'unsupported by substantial evidence on the record....'" *Matsushita Elec. Industrial Co. v. United States,* 3 Fed. Cir. (T) 44, 54, 750 F.2d 927, 936 (1984). In other words, the court must determine whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support [Commerce's] conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)(quoted in *Matsushita,* 3 Fed. Cir. (T) at 51, 750 F.2d at 933).

> Here, Commerce explained,
>
> [o]ur methodology recognizes the fact that the G & A expense category consists of a wide range of different types of costs which are so unrelated or indirectly related to the immediate production process that any allocation based on a single factor (e.g., headcount) is purely speculative.

Japan Final, 61 Fed.Reg. at 38,149.

In verifying the information submitted by MHI, including information regarding the range of activities undertaken by MLP, Commerce found substantial evidence demonstrating that for LNPPs, as well as commercial presses, MLP "sells, installs and

---

**4.** MHI does not dispute that parts were added to the subject merchandise during the installation process. *See* MHI brief at 18 ("[W]hether or not the parts procured in the United States were 'integral' to the operation of a press, MHI's evidence demonstrated that those parts were sourced in the United States simply to save the shipment costs of sending them to Japan for re-

export to the United States.") The reason for MHI's decision to purchase certain parts in the United States is not relevant to this Court's decision. Commerce's practice has been to classify installation as further manufacturing when that installation included the addition of integral, non-subject components. That practice is in accordance with law.

services" the presses, purchases certain components in the United States and installs the press at the customer's plant. Verification of Constructed Value Data at 36. That MHI "can point to evidence of record which detracts from ... [Commerce's] decision and can hypothesize a reasonable basis for a contrary determination is neither surprising nor persuasive." *Matsushita*, 3 Fed. Cir. (T) at 54, 750 F.2d at 936. Commerce provided evidence demonstrating that a wide range of functions are performed for both commercial presses and LNPP, and that these functions require a wide range of costs, beyond personnel. Therefore, Commerce's decision to allocate G & A expenses based on a CGS rather than a headcount methodology was appropriate.

4. *Indirect Selling Expenses Incurred in Japan for MHI*

■ The CEP provision requires that Commerce reduce the price of the first sale to an unaffiliated customer in the United States by the amount of selling expenses "incurred by or for the account of the producer or exporter, or the affiliated seller in the United States, in selling the subject merchandise...." 19 U.S.C. § 1677a(d)(1). Indirect selling expenses are a component of selling expenses. *See* 19 U.S.C. § 1677a(d)(1)(D) (requiring that Commerce deduct from CEP any selling expenses not deducted as commissions or direct selling expenses). As part of indirect selling expenses, Commerce included expenses incurred in Japan to support U.S. sales. MHI argues that Commerce should have deducted only those indirect selling expenses incurred by MLP in the United States.

The CEP methodology is intended to determine a U.S. price "calculated to be, as closely as possible, a price corresponding to an export price between non-affiliated exporters and importers." MHI brief at 21 (quoting SAA at 823). "Accordingly, when ITA makes its CEP adjustments to U.S. price, its objective is to identify indirect selling expenses that would not exist in an EP sale and deduct those expenses...." *Id.* at 22. MHI contends that Commerce should not have deducted expenses incurred by

MHI in Japan "for ... activities that were fully consistent with an EP transaction." *Id.*

However, once Commerce has decided to rely on CEP, the statute does not require that Commerce examine every potential CEP deduction to determine whether the activity generating the expense would be inconsistent with an EP transaction. The statute contains a list of mandatory deductions, which includes selling expenses incurred in selling the subject merchandise. The statute does not specify as to the location of the activities generating these expenses. Here, Commerce deducted all indirect selling expenses related to respondents' United States sales. This decision was consistent with the statutory CEP provision.

MHI makes a second argument, that the SAA specifically limits CEP deductions to "expenses (and profit) associated with economic activities occurring in the United States." SAA at 823. MHI interprets this provision to require that the activities generating the deducted costs must occur in the United States. However, MHI's reading is too narrow. Expenses incurred outside of the United States could still be "associated with" economic activities occurring in the United States. Commerce's approach limited the deductions to those indirect selling expenses "directly associated" with U.S. economic activity. Germany Final at 38,174. Thus, Commerce's application of the statute was limited enough to be consistent with the interpretation of the statute articulated in the SAA.

■ The petitioner, Goss, objects to Commerce's allocation of respondents' indirect selling expenses incurred in Japan and Germany, arguing that "Commerce undervalued these expenses by deducting only that portion of the indirect selling expenses attributable to U.S. sales when calculating the CEP." Brief Support Goss Graphic Systems, Inc. Rule 56.2 Mot. J. Agency Rec. Comp./Country–Specific Issues at 6 ("Goss brief").

The Court will not address Goss' argument at this time, because in reviewing its allocation of indirect selling expenses to U.S. sales, Commerce came to the conclusion that its methodology overstated the amount of indi-

rect selling expenses to be deducted from CEP. Specifically, Commerce explained that the pool of indirect selling expenses incurred in the home market and allocated to MHI's U.S. sales included "various office and planning expenses .... [that] are not the type of expenses that ordinarily would be associated with United States economic activity." Response Court's April 21, 1998 Ord. Regarding Treatment Indirect Selling Expenses at 2.

In *Koyo Seiko Co. v. United States*, the Court observed that "[t]here can be no doubt that Congress intended final determinations to be precisely that." 14 CIT 680, 682, 746 F.Supp. 1108, 1110 (1990). However, the court added, "failure to reopen a determination which is known to be based on erroneous factual information that would clearly mandate a change in result would itself be arbitrary and capricious." *Id.* at 683, 746 F.Supp. at 1111 (citing *Timken Co. v. United States*, 7 CIT 319, 320 (1984)). *See also Federal–Mogul Corp. v. United States*, 18 CIT 1168, 1171–72, 872 F.Supp. 1011, 1014 (1994) (granting Commerce's request for remand to correct "inadvertent" factual errors).

As stated above, indirect selling expenses must be associated with economic activity occurring in the United States. Commerce erred by deducting certain expenses that were not so associated. Therefore, the Court will remand this issue, pursuant to Commerce's request, in order that Commerce may correct its error. Upon remand, Commerce will evaluate whether its allocation methodology either understates or overstates respondent's indirect selling costs. Commerce must also respond to TKS's argument that Commerce overstated its indirect selling expenses in the same way it overstated MHI's.

### 5. *The CEP Offset for MHI and TKS*

 MHI and TKS both contend that they were entitled to a CEP offset, pursuant to 19 U.S.C. § 1677b(a)(7)(B):

When normal value is established at a level of trade which constitutes a more advanced stage of distribution than the level of trade of the constructed export price, but the data available do not provide an appropriate basis to determine ... a level of trade

adjustment, normal value shall be reduced by the amount of indirect selling expenses incurred in the country in which normal value is determined on sales of the foreign like product....

Commerce declined to grant the adjustment because, "[i]n this instant investigation, the respondents failed to provide the Department with the necessary data for the Department to consider an LOT [level-of-trade] adjustment.... Absent this information, the Department cannot determine whether an LOT adjustment is warranted, nor whether the level of trade in the home market is in fact further removed than the level of trade in the United States." Japan Final at 38,143.

As the SAA makes clear, "if a respondent claims an adjustment to decrease normal value, as with all adjustments which benefit a responding firm, the respondent must demonstrate the appropriateness of such adjustment." SAA at 829. In this case, Commerce concluded that neither TKS nor MHI had provided sufficient information to demonstrate the appropriateness of the CEP offset. Specifically, Commerce said,

[r]espondents now contend that there is one home market level of trade to which CEP is being compared, but this claim is not well substantiated. The information we have on the record for sales in the home market does not support this conclusion. .... For neither TKS nor MHI can we ascertain which selling functions are performed by them and which are provided by leasing companies, trading companies or other entities for each type of home market sale. Thus the minimal amount of information provided does not support the conclusions reached by respondents.

Japan Final, 61 Fed.Reg. at 38,143.

Commerce's conclusion was based upon substantial evidence. *See* MHI QR Response at A–17 to A–22 (describing only in general terms the functions of MHI and its affiliated and non-affiliated trading companies in MHI's home-market sales). For TKS *see* TKS QR Response (N–P Doc. 39) at A–30 (failing to explain role of leasing company discovered at verification to have been in-

volved in at least one TKS home-market sale). *See also* TKS Verification Report (N–P Doc. 191) at 18 ("For this sale ... the original customer ... requested that its purchase be transferred to a leasing company, ... which resulted in the issuing of a new purchase order...."). In the absence of sufficient information, Commerce's refusal to grant either an adjustment or a CEP offset was appropriate.

■ MHI also complains that "[n]ot once in the investigation did ITA advise MHI that it believed MHI's filings to be deficient" in establishing MHI's right to a CEP offset. MHI Brief at 26–27. However, Commerce had no obligation to give MHI such a warning.

In its Section A questionnaire, Commerce explicitly requested all information relevant to a LOT analysis. Specifically, Commerce explained,

> [t]he description you provide of your channels of distribution and sales process ... is intended to provide the Department with the information necessary to make appropriate comparisons of sales at the same level of trade or to adjust normal value, if appropriate, when sales are compared at different levels of trade. Your response to this section may be of critical importance to this investigation. Accordingly, your response should include all the information requested and all information you believe the Department should consider in making a comparison....

ITA Section A QR (Pub.Doc. 73) at A–10. Thus, Commerce gave MHI ample opportunity to present such information.

TKS argues that it did not claim a level of trade adjustment until the final stage of the investigation because Commerce did not decide to deduct Japan-based indirect selling expenses until after it issued its preliminary determination. Mem. Pl. Tokyo Kikai Seisakusho, Ltd. Support Mot. J. Agency R. Comp.–Specific Issues at 31 ("TKS brief"). "The CEP offset was necessary in that event, because home market sales would be at a more remote stage of distribution than CEP sales." *Id.* at 31–32. As with MHI, however, TKS had ample opportunity to provide Commerce with level of trade information. In the absence of such information, Commerce was justified in refusing to grant either a level of trade adjustment or CEP offset.

## II. IMPUTED CREDIT EXPENSE

### 1. *Imputed Credit Prior to Shipment*

■ In calculating both normal value and U.S. price, Commerce made a circumstance-of-sale adjustment for credit expenses incurred during production of the subject merchandise, prior to shipment, pursuant to 19 U.S.C. § 1677b(a)(6)(c).[5] Commerce's usual imputed credit calculation is based only on the cost of financing receivables between shipment date and payment date. Germany Final at 38,187.

MHI concurs in the argument presented by MAN Roland,[6] a respondent in Commerce's Germany investigation, that Com-

---

**5.** Section 1677b(a)(6)(C) requires that in calculating normal value, Commerce shall adjust the price of the foreign like product by "the amount of any difference between the EP or CEP and the price [of the foreign like product] ... that is ... wholly or partly due to ... differences in the circumstances of sale."

**6.** Commerce argues that MHI may not raise this argument because it failed to raise it at the administrative level. The Court does not agree. According to the statute, "the Court of International Trade shall, *where appropriate*, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (emphasis added). "In light of this quoted language, Congress did not intend § 2637(d) to be jurisdictional in nature." *Al Tech Specialty Steel Corp. v. United States*, 11 CIT 372, 376, 661 F.Supp. 1206, 1209 (1987) (citing

*United States v. Priority Prods., Inc.*, 4 Fed. Cir. (T) 88, 92–93, 793 F.2d 296, 300 (1986)) (other citations omitted). Thus, "[i]t is within this court's discretion to determine whether the particular manner of failure to exhaust administrative remedies warrants preclusion of consideration of the new issue." *Rhone Poulenc, S.A. v. United States*, 7 CIT 133, 136, 583 F.Supp. 607, 611 (1984). The exhaustion doctrine reflects a "respect for values of judicial economy and 'administrative autonomy,'" *Al–Tech*, 11 CIT at 377, 661 F.Supp. at 1210 (citing *McKart v. United States*, 395 U.S. 185, 194, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969)). Permitting MHI to raise this issue would not conflict with those values. Commerce had ample opportunity to respond to this question at the administrative level, where it was raised by MAN Roland.

merce's adjustment for pre-shipment credit expense is "flatly inconsistent with the Department's past decisions regarding the types of items for which a circumstance-of-sale adjustment can be made," and that "[i]n past cases, the Department has specifically held that a circumstance-of-sale adjustment cannot be made for production costs." MAN Roland Brief at 11–12.[7]

Furthermore, MAN Roland argues, "it is fundamentally illogical to treat the imputed cost of financing production as a selling expense, or as part of the adjustment for credit expenses." *Id.* at 13. The credit expense, MAN Roland argues "is simply a tool for measuring the effect of ... payment terms on the real economic price paid by the customer .... if MAN Roland allows its customers to pay later, the economic value of the payment it receives is less." *Id.* The imputed cost of financing production, MAN Roland argues, "has no effect on the price paid by the customer. Rather, it depends on MAN Roland's internal production scheduling decisions." *Id.* at 14.

The statute requires that constructed value be "increased or decreased by the amount of any difference ... between the [U.S. price] and [constructed value] ... that is established to the satisfaction of the administering authority to be wholly or partly due to ... differences in circumstances of sale." 19 U.S.C. § 1677b. The statute does not define the term circumstance of sale. Thus, Commerce has broad discretion in determining what constitutes a circumstance of sale. *See Sawhill Tubular Div. Cyclops Corp. v. United States,* 11 CIT 491, 497, 666 F.Supp. 1550, 1555 (1987) ("It is ... clear that Congress has deferred to the expertise of the agency and vested broad discretion in it to make adjustments for the differences in the circumstances of sale...."). That discretion, however, is limited. "One recognized limitation upon this power is that adjustment be made for those factors and conditions which have a direct bearing on or relationship to the sales under consideration." *Id.*

In the final determination, Commerce explained,

> We believe that it is appropriate in this instance to recognize the comprehensive financing arrangement for each sale as a circumstance of sale adjustment. LNPPs require substantial capital expenditures over an extended time period because of their size and lengthy production process.... Moreover, the projects generally call for the purchaser to provide scheduled progress payments before completion of a project. Our normal imputed credit calculation ... does not measure the effect of progress payments made relative to production costs incurred. To adjust sales prices for the effect of the respondent incurring significant capital outlays at the beginning of a project ... or receiving large sums of money up front ... we calculated imputed credit for each home market and U.S. sale....

61 Fed.Reg. at 38,187. Commerce calculated imputed interest by subtracting progress payments from capital outlays made during the construction period and then multiplying the balance by the applicable interest rate. *See* Mem. Re: Constructed Value, Further Manufacturing and Constructed Export Price Adjustments for Final Det., N–P Doc. 107 at 4. Commerce's treatment of the imputed interest as a circumstance of sale allowed it to fully recognize the complexity of the financing arrangements at issue here. Given that construction on a single sale in this case may take several years to complete, as well as the fact that financing arrangements may vary widely from sale to sale, the Court finds Commerce's decision to treat the imputed interest expenses as a circumstance of sale was reasonable.

MAN Roland argues that Commerce's actions here were inconsistent with its actions in *Zenith Electronics Corp. v. United States,* 18 CIT 870, 1994 WL 520922 (1994). In *Zenith,* Commerce made a circumstance of sale adjustment for respondent's imputed credit expense. However, Commerce re-

---

**7.** MAN Roland also argues that Commerce's actions were inconsistent with cases decided subsequent to the determination at issue here. Commerce has no obligation to act consistently with subsequent decisions. If the cases are inconsistent, it would be incumbent upon Commerce to explain why its subsequent decisions were inconsistent with this one.

fused to offset the imputed credit expense—based on "the average duration of accounts receivable,"—by "the average duration of accounts payable." *Id.* at 875, 1994 WL 520922. Commerce explained,

> by allowing the customer a period of time to pay, the seller effectively reduces the sales price of the merchandise because of the time value of money.... To the extent that a manufacturer can delay paying its suppliers, the cost of materials is reduced by the time value of money, resulting in a saving in the cost of production. Since accounts payable are, thus, production costs, they cannot result in a circumstance-of-sale adjustment.

*Id.* at 875, n. 8. Commerce explained further, that it could not treat accounts payable as a circumstance of sale adjustment because doing so "would require us to adjust for factors relating to cost of production, which are unrelated to the *sales* at issue." *Id.* In this case, unlike *Zenith,* Commerce made the imputed interest adjustment to compensate for different payment schedules by customers to respondent. Thus, the adjustment was directly related to the sales at issue and appropriately treated as a circumstance of sale.

## 2. *The currency of the imputed credit expense*

■ Even if the Court finds Commerce's pre-shipment imputed credit adjustment to be appropriate, MHI argues, Commerce erred in using a dollar-denominated interest rate for financing production of presses for U.S. customers and a yen-denominated rate for home market presses.

According to MHI,

> [a]ny production financing costs incurred by MHI, however, did not vary based on the nationality of the customer or the currency in which a particular contract was denominated. Indeed there is *no* evidence on the record that MHI borrowed more expensive dollars to finance production of presses just because those presses were destined to U.S. customers, nor would such an assumption make commercial sense.

MHI Brief at 31. For this reason, MHI argues, Commerce's action violated "the clear instruction of the Court of Appeals of

the Federal Circuit that credit expenses must be 'imputed on the basis of usual and reasonable commercial behavior.'" MHI Brief at 31 n. 107 (citing *LMI–LaMetalli Industriale, S.p.A. v. United States,* 8 Fed. Cir. (T) 157, 163, 912 F.2d 455, 461 (1990)).

MHI makes a similar argument with regard to Commerce's use of a U.S. dollar interest rate to calculate MHI's imputed credit expense incurred after shipment but before payment. MHI relies on *LMI* for the proposition that "where a foreign seller has access to financing at a low interest rate, and there is evidence that the seller can take advantage of that less expensive financing, it is unreasonable to base imputed credit expense on some other higher interest rate." MHI Brief at 32. Here, MHI argues, the U.S. interest rate was significantly higher than the corresponding yen-denominated interest rate. "Accordingly, it would have made no commercial sense for MHI to finance its receivables in more expensive dollars, and the record shows that MHI did not engage in such conduct." *Id.* at 33.

MHI's reliance upon *LMI* is misplaced. In *LMI,* as in cases decided prior to *LMI,* Commerce based imputed credit on the respondent's actual cost of borrowing, or in the absence of actual borrowing, respondent's theoretical cost of borrowing. The *LMI* court held that the theoretical cost of borrowing must be based on commercial reality. Commerce's current practice, however does not focus on the cost of borrowing, but on the currency in which the sale is denominated. As Commerce explained,

> A company selling in a given currency ... is effectively lending to its purchasers in the currency in which its receivables are denominated.... Thus, when sales are made in, and future payments are expected in, a given currency, the measure of the company's extension of credit should be based on an interest rate tied to the currency in which its receivables are denominated.

Japan Final at 38,160 (citing *Oil Country Tubular Goods from Austria,* 60 Fed.Reg. 33,551, 33,555 (Dep't Commerce 1995) (final det.)).

The circumstance of sale provision does not specify the currency in which imputed credit expenses are to be calculated. Thus, the Court will defer to Commerce's permissible interpretation of the statute. Here, the Court finds, Commerce's interpretation was reasonable. "The imputation of credit cost is based on the principle of the time value of money." *LMI* at 460. Commerce's decision that imputed credit should reflect the time value of the currency in which the transaction is actually carried out was reasonable, as it reflects the actual benefit to the buyer and the loss to the seller that results from delaying payment.[8]

### 3. *Deduction of Imputed Credit Expenses from Normal Value*

▮ In addition to deducting imputed credit expense from United States price, Commerce adjusted normal value by deducting an amount for imputed credit. Petitioner objects to this deduction.

In the underlying investigation, Commerce based normal value on constructed value ("CV")pursuant to its authority under 19 U.S.C. § 1677b(a)(4)[9]. Goss argued that Commerce should have added an amount for imputed credit expense to respondents' CV. Only then, Goss argued, would the imputed credit deduction have been appropriate. Japan Final at 38,147. However, Commerce explained, the statute requires that Commerce "include in CV the actual amount of SG & A expenses ... incurred by the exporter or producer. Imputed credit is, by its nature, not an actual expense. Therefore, we did not include imputed credit in the CV calculation for the final determination." *Id.* at 38,147.

Goss now argues, "[t]he constructed value is based on the actual costs of production that, by their nature, cannot include an imputed credit expense. Therefore, adjusting [normal value] for an imputed credit expense defies common sense—there is no credit expense to deduct." Goss Brief at 2.

In the final determination, Commerce did not specifically address the issue raised by Goss, whether normal value may be adjusted for an imputed credit expense when normal value is based on constructed value.

According to the statute, a normal value that is based on constructed value is subject to the same adjustments as normal value based on home-market or third-country sales. 19 U.S.C. § 1677b(a)(8). One of these adjustments is the circumstance-of-sale adjustment. *See* 19 U.S.C. § 1677b(a)(6)(C). Commerce describes the imputed credit adjustment as a circumstance-of-sale adjustment. Germany Final at 38,187.

In its final calculation memorandum, Commerce explains that it adjusted both United States price and normal value for imputed credit. In its brief to this Court, Commerce explains that it subtracted imputed credit from both sides of the margin calculation in order that the two might be calculated on an equal, i.e. net-imputed-credit, basis. Def.'s Mem. Opp. Pls.' Mot. J. Admin. Rec. at 57 ("Commerce brief").

However, Goss contends that normal value was on a net-imputed-credit basis prior to Commerce's adjustment. "The imputed credit cost in this case reflects differences in timing between receipt of payments and expenditures for production. Therefore, the constructed value cannot include imputed credit expenses—it is only the sum of actual

---

**8.** MHI also argues that Commerce's statement that its use of a dollar-denominated interest rate "was intended to account for 'the effect of currency fluctuations on repatriating revenue,'" constitutes evidence that Commerce's actions were inconsistent with the statute. MHI Brief at 33 (quoting Japan Final at 38,160). "The statute, ... could not be clearer on this issue: 'Fluctuations in exchange rates shall be ignored.'" *Id.* (citing 19 U.S.C. § 1677b–1(a)). Commerce's statement regarding currency fluctuations does not alter the fact that Commerce gave a reasonable explanation for its decision to base imputed credit expense on the currency of the transaction

at issue. Furthermore, Commerce did not change its practice in any way to adjust for currency fluctuations. Therefore, Commerce's action did not violate the statute.

**9.** 19 U.S.C. § 1677b(a)(4) provides, "[i]f the administering authority determines that the normal value of the subject merchandise cannot be determined under paragraph (1)(B)(i) [based on home-market sales], then, ... the normal value of the subject merchandise may be the constructed value of that merchandise...."

costs and has no payment schedule associated with it." Goss Brief at 5.

In its brief, Commerce explains that under the current statute, profit for constructed value is calculated based on respondents' actual profit amounts on home-market sales. "By using the actual profit, the CV reflects a foreign value unadjusted for imputed credit." Commerce brief at 57. In other words, Commerce is saying that when an actual profit is used, imputed credit is reflected in the profit amount.

However, the Court cannot sustain Commerce's actions based on post hoc rationalizations by agency counsel. *See Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("[T]he courts may not accept appellate counsel's *post hoc* rationalizations for agency action.... It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.") (citations omitted). Therefore, the Court is remanding so that Commerce may explain its decision on the record.

### III. CONSTRUCTED VALUE ISSUES

Commerce based normal value on constructed value, reasoning that while home market sales of the foreign like product were "viable" (i.e., sufficient in volume), pursuant to 19 U.S.C. § 1677b(a)(1)(C) [10], the market situation was characterized by "(1) a unique demand pattern prevalent in each national market; (2) unique technical specifications required for each highly customized LNPP sold; and (3) very low volume of individual LNPP sales in the normal business cycle." Commerce Brief at 14. Commerce's decision to rely on constructed value is not challenged here.

#### 1. *Computation of SG & A and Profit*

In constructing the value of the subject merchandise, Commerce requested information from respondents regarding their selling, general and administrative costs ("SG & A") and profit for home market sales. Rath-

er than using respondents' reported profit margins, however, Commerce asked respondents to report contract price and production cost data for their home market sales of LNPPs. ITA Concurrence Mem.: Prelim. Det.—Antidumping Duty Investigation of LNPPs from Japan (N–P Doc. 152) at 9–10 ("Preliminary Det. Concurrence Mem."). Commerce used this information to calculate SG & A and profit amounts to be used for constructed value.

#### A. Treatment of Below–Cost Sales

According to Commerce, the cost data submitted by respondents "indicated that there were below-cost sales made in the home market...." Japan Final at 38,145. In calculating profit and SG & A expenses from the reported data, Commerce excluded such below-cost sales. MHI and TKS object to Commerce's exclusion of below-cost sales.

 MHI argues that Commerce had no authority to collect detailed cost information solely for its calculation of SG & A and profit amounts. "The scheme established by Congress was to have [Commerce] rely on sales-specific data *if it had been collected for some other purpose*, but otherwise to use respondents' financial reports or other available information." MHI Brief at 34.

Typically, Commerce collects sales-specific cost data for home-market sales in cases in which normal value is based on home-market sales. According to the statute, "[w]henever the administering authority has reasonable grounds to believe or suspect that sales of the foreign like product under consideration for the determination of normal value have been made at prices which represent less than the cost of production ..., the administering authority shall determine whether, in fact, such sales were made at less than the cost of production." 19 U.S.C. § 1677b(b)(1). The statute specifies that "[t]here are reasonable grounds to believe or suspect" below-cost sales, if "an interested party ... pro-

---

**10.** Section 1677b(a)(1)(C)(ii) requires that if Commerce determines "that the aggregate quantity ... of the foreign like product sold in the exporting country is insufficient to permit a proper comparison with the sales of the subject mer-

chandise to the United States ..." Commerce should calculate normal value on a basis other than home-market sales. 19 U.S.C. § 1677b(a)(1)(B) and (C).

vides information, based upon observed prices or constructed prices or costs, that sales of the foreign like product ... have been made at prices which represent less than the cost of production of the product...." 19 U.S.C. § 1677b(b)(2)(A)(i).

Although Commerce received a below-cost allegation from petitioners in this case, it did not formally initiate a cost investigation because it had decided to base normal value on constructed value rather than home-market sales. Japan Final at 38,144–45.

MHI argues that in the absence of a formal below-cost investigation, Commerce was obligated to use profit data provided by MHI from its financial statements. "When Congress enacted the new profit-related provisions in 1994, it did not give ITA new authority to conduct cost investigations." MHI Brief at 34. In support of its position, MHI cites 19 U.S.C. § 1677b(e)(2) which provides that in calculating constructed value, Commerce shall use "the actual amounts incurred and realized by the specific exporter or producer being examined in the investigation ... for selling, general and administrative expenses, and for profits, ...," 19 U.S.C. § 1677b(e)(2)(A), but that if such data "are not available," then Commerce is to rely on one of three alternatives. 19 U.S.C. § 1677b(e)(2)(B). Commerce relied on section 1677b(e)(2)(A) for calculating SG & A using "the actual amounts incurred and realized." MHI argues that Commerce should have relied on one of the three alternatives. In essence, MHI is arguing that if cost data has not been collected for some other purpose, then it cannot be considered to be "available."

The Court finds MHI's interpretation of the statute to be overly narrow. The statute does not define the term "available." Thus, the Court will defer to Commerce's interpretation of the term if it is reasonable. Here, Commerce reviewed MHI's questionnaire response and determined that a sufficient number of home-market transactions had oc-

curred, that the company had cost information about those transactions in its records and that the company could provide such information to Commerce. Commerce decided that these facts in combination were sufficient to render the requisite information available.

Commerce's decision represents a reasonable application of the statute. The SAA states that the alternative methodologies established by section 1677b(e)(2) are to be used "in those instances where the method described in section [1677b(e)(2)(A) ] cannot be used, either because there are no home-market sales of the foreign like product or because *all* such sales are at below-cost prices." SAA at 840 (emphasis added). Commerce determined that neither of these circumstances existed here, and therefore, the information was available.[11]

 TKS argues that Commerce's decision to conduct a "de facto" cost test rather than initiating a formal below-cost investigation was inconsistent with the statutory requirement that Commerce have "reasonable grounds to believe or suspect that sales of the foreign like product ... have been made at prices which represent less than the cost of production...." 19 U.S.C. § 1677b(b)(1).

Rather than responding to Goss's below-cost allegation, TKS complains, Commerce elected to conduct a "de facto" cost test on home market sales.

"[Commerce] has justified its *de facto* cost test by claiming that the home market price and cost data submitted by TKS showed below-cost sales, *viz.*, provided reasonable grounds to suspect below-cost sales." TKS Brief at 11. Commerce's actions were unlawful, TKS argues, because Commerce's below-cost test was not based on reasonable suspicion as defined by the statute. Therefore, TKS argues, Commerce should not have excluded below-cost sales.

Like MHI, TKS reads the statute's requirements too narrowly. Commerce is to

---

11. MHI quotes a different section of the SAA in support of its argument that Commerce was not entitled to collect the sales information. *See* MHI Brief at 34 n. 119 (citing SAA 824–25). However, the section of the SAA that MHI cites

concerns the calculation of profit for CEP. Therefore, this section is not applicable to Commerce's calculation of SG & A and profit in determining normal value.

calculate SG & A and profit for constructed value using only those sales of the foreign like product that were made *in the ordinary course of trade.* 19 U.S.C. § 1677b(e)(2)(A). The statute defines sales and transactions considered outside the ordinary course of trade to include "among others," sales disregarded under section 1677b(b)(1). 19 U.S.C. § 1677(15).

Based on the sales data gathered by Commerce to calculate SG & A and profit, Commerce determined that certain sales would have been excludable under 19 U.S.C. § 1677b(b)(1) had Commerce decided to base normal value on home-market sales and carry out a below-cost investigation. Commerce's decision to treat such sales as outside the ordinary course of trade, relying on the "among others" language of section 1677(15) was a reasonable application of the statute.

Although the sales were not discovered in the type of investigation prescribed by section 1677b(b)(1), Commerce found that the sales did have the characteristics of a sale that would be excludable under 1677b(b)(1). Congress mandated that sales with those characteristics be treated as "outside the ordinary course of trade" for purposes of calculating normal value. *Id.* Therefore, it was reasonable for Commerce to treat such sales as outside the ordinary course of trade for purposes of calculating SG & A and profit.

■ MHI also argues that Commerce did not have the authority to disregard below-cost sales without formally initiating a cost investigation.

Formal cost investigations exist so that respondents have notice that information in a respondent's defense should be submitted to [Commerce] for consideration. In this case, because a cost investigation was never initiated, MHI was never on notice that it should provide data showing that it could recover its costs over time. By conducting an 'informal' cost investigation, ITA usurped a procedural protection afforded respondents under the Act.

MHI Brief at 35. According to the statute, "[i]f prices which are below the per unit cost

of production at the time of sale are above the weighted average per unit cost of production for the period of investigation ... such prices shall be considered to provide for recovery of costs within a reasonable period of time." 19 U.S.C. § 1677b(b)(2)(D).

As explained above, Commerce was not required to initiate a formal below-cost sales investigation in order to exclude below-cost sales from its profit and SG & A calculations. Commerce's failure to do so did not deprive MHI of any procedural protection. Commerce requested and received complete cost information for all home-market sales that took place during the investigation. Based on this information, Commerce determined that certain sales had been made at below-cost prices. Because Commerce treated each individual sale as a separate model,[12] Commerce knew that for any specific model, cost-recovery over time would not be possible. By definition, there was only one sale for each model. Therefore, Commerce reasonably determined that MHI would not be able to recover its costs on below-cost sales during the period of investigation, as the statute requires. No information provided by MHI could have altered this conclusion.

2. *The Model–Specific Cost Test*

■ Under 19 U.S.C. § 1677b(b)(1), below-cost sales may be excluded only if they "have been made within an extended period of time in substantial quantities," and "were not at prices which permit recovery of all costs within a reasonable period of time...." 19 U.S.C. § 1677b(b)(1)(A), (B). The statute also states that "[s]ales made at prices below the cost of production have been made in substantial quantities if—(i) the volume of such sales represents 20 percent or more of the volume of sales under consideration for the determination of normal value...." 19 U.S.C. § 1677b(b)(2)(C).

Commerce typically conducts the substantial quantities test on a model-specific basis. In other words, if below-cost sales represent 20 percent or more of the volume of sales of a specific model of subject merchandise, then those sales may be excluded. *See* SAA at

832 ("As under current practice, the cost test generally will be performed on no wider than a model-specific basis."). In accordance with its usual practice, Commerce carried out its below-cost test here on a model-specific basis. However, due to the "unique nature of the products under investigation, [Commerce concluded] that each home market sale of an LNPP, addition, or component constitutes a distinct model for purposes of performing the cost test," and calculated an individual normal value for each sale. Preliminary Det. Concurrence Mem. at 10. "Therefore, where that single sale was made at less than the cost of production, the 'substantial quantities' requirement [was] necessarily met because that single below-cost sale represent[ed] 100 percent of the volume of sales considered in the determination of normal value." Commerce Brief at 67.

MHI and TKS contend that Commerce's actions were inconsistent with the statute. "ITA disregarded the 'substantial quantities' requirement of the Act by treating each sale as its own model, then applying the 'substantial quantities' test on a model-specific basis." MHI Brief at 36–37. Commerce's approach was "contrary to the Act because it resulted in the *automatic* exclusion of below-cost sales." *Id.* at 37.

TKS argues that Commerce's actions were inconsistent with the statutory requirement that "[i]f prices which are below the per unit cost of production at the time of sale are above the weighted average unit cost of production for the period of investigation ... such prices shall be considered to provide for recovery of costs within a reasonable period of time." 19 U.S.C. § 1677b(b)(2)(D). TKS argues that Commerce's method presumed that for any below-cost LNPP sale, cost recovery would not occur, presumably because, by definition, there could never be more than one sale of the same model. TKS Brief at 15. In effect, TKS argues, ITA's model-specific methodology for the cost test resulted in the automatic exclusion of below-cost sales in every instance. "Thus, the methodology, in effect, nullified the substantial quantities and cost recovery criteria of section [1677b(b)(1) ]." *Id.* at 16.

The Court agrees with Commerce that the model-specific cost test represents a permissible application of the statute. Use of the model-specific cost test is part of Commerce's usual practice. Furthermore, it was sanctioned in the SAA. *See supra*, p. 826.

The use of the model-specific cost test in this case is consistent with both the statute and Congressional intent as expressed in the legislative history of the below-cost sales provision.

These standards would not require the disregarding of below-cost sales in every instance, for under normal business practice ... it is frequently necessary to sell obsolete or end-of-model year merchandise at less than cost. Similarly, certain products, such as commercial aircraft, typically require large research and development costs which could not reasonably be recovered in the first year or two of sales. Thus, infrequent sales at less than cost, or sales at prices which will permit recovery of all costs based upon anticipated sales volume over a reasonable period of time would not be disregarded.

S.Rep. No. 1298, 93d Cong., 2d Sess, 173 (1974) *reprinted in* U.S.C.C.A.N.1974 at 7310–7311.

LNPPs are custom-made to order. For that reason, obsolete or end-of-model year merchandise sales would be unlikely to occur. Furthermore, the merchandise at issue here is not similar to other large-ticket items such as commercial aircraft. Unlike commercial aircraft, for example, LNPPs are sold in limited numbers and built individually to the buyer's specifications. For these reasons, Commerce's determination that a producer would be unable to recover costs based upon future sales volume, was reasonable.

Case law also supports Commerce's actions here. In previous cases, this court has endorsed Commerce's discretion to tailor the provisions of § 1677b(b)(1) to particular circumstances and classes of merchandise. For example, in *INA Walzlager Schaeffler KG v. United States*, 915 F.Supp. 420 (CIT 1996), *aff'd* 108 F.3d 301 (Fed.Cir.1997), the court upheld Commerce's decision to make an exception to its usual "extended period of time" definition. The statute governing that case

said that below-cost sales should be excluded if they had been made over an extended period of time. 19 U.S.C. § 1677b(b)(1)(1988).[13] Commerce's usual practice had been to define an extended period of time as consisting of three months. *Ina Walzlager,* 915 F.Supp. at 423. However in *Ina Walzlager,* Commerce had made an exception because certain models were sold in less than three months during the period of review. *Id.* Commerce explained as follows:

> Occasionally, sales occur in less than three months of an investigation or review. This is not an expected normal pattern, but an exception from the pattern of sales for which the three month guideline was developed. If three months were defined as the extended period of time when such a pattern occurred, sales below cost would never be disregarded. This result does not reflect Congressional intent, unless the goods were obsolete or end of model year.

*Id.* at 424 n. 2. The court agreed with Commerce, that "Commerce's interpretation of 'extended period of time,' in this particular proceeding, constituted a reasonable exercise of discretion in determining when to disregard below-cost sales...." *Id.* at 424. Similarly, the Court finds that model-specific cost test used in this case was a permissible application of the statute.

The Court also finds that Commerce's determination that each sale represented a separate model was supported by substantial evidence on the agency record. *See* Memo Re: Determining the Appropriate Basis for Normal Value, Nov. 9, 1995 (N–P Doc. 73) at 3. ("Many factors underlie the particular market situation in this investigation. Most important among these are: (1) the unique demand pattern prevalent in each national market; (2) the unique technical specifications required *for each highly customized product sold;* and (3) the very low volume of individual LNPP sales in the normal business cycle.") (emphasis supplied).

Therefore, the Court sustains Commerce's decision with regard to this issue.

*3. Foreign Like Product*

■ As a further challenge to Commerce's constructed value calculation, MHI and TKS object to different aspects of Commerce's "foreign like product" determination.

In calculating profit margins for constructed value, Commerce relied on 19 U.S.C. § 1677b(e)(2)(A), which states that CV profit is to be based upon "the actual amounts incurred and realized by the specific exporter or producer ... in connection with the production and sale of a foreign like product...." Foreign like product is defined as follows:

> (A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.
>
> (B) Merchandise—
>
> (i) produced in the same country and by the same person as the subject merchandise,
>
> (ii) like that merchandise in component material or materials and in the purposes for which used, and
>
> (iii) approximately equal in commercial value to that merchandise.
>
> (C) Merchandise—
>
> (i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,
>
> (ii) like that merchandise in the purposes for which used, and
>
> (iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16). TKS contends that the findings that led Commerce to rely on CV rather than home-market sales in calculating normal value constitute evidence that no foreign like product exists in the home

---

**13.** The law has since changed. The statute now requires that below-cost sales have been made *within* an extended period of time. "By providing that below-cost sales need occur only *within* (rather than *over*) an extended period of time,

Commerce no longer must find that below-cost sales occurred in a minimum number of months before excluding such sales from its analysis." SAA at 832.

market. Specifically, TKS cites Commerce's findings that the LNPP market is characterized by "(1) [a] unique demand pattern ... in each national market; (2) ... unique technical specifications required for each highly customized product sold; and (3) ... very low volume of individual LNPP sales in the normal business cycle." Mem. re: Determining the Appropriate Basis for Normal Value, Dep't Commerce, November 9, 1995, Prop. Doc. 73 at 3. In the absence of an appropriate foreign like product, TKS argues Commerce should not have relied on 19 U.S.C. § 1677b(e)(2)(A) for calculating profit and SG & A.

In the Final Determination, Commerce argued that "TKS is incorrect to suppose that because we did not find home market sales which provided practicable price-to-price matches, no foreign like product existed. The foreign like product as defined by [19 U.S.C. § 1677(16)], (*i.e.*, sales of LNPP in Japan) did exist...." Final Determination at 38,146. However, Commerce does not explain which of the three foreign like product definitions it relied upon in classifying LNPPs sold in the home market as foreign like product. Therefore, the Court is unable to evaluate whether or not Commerce's decision is in accordance with law and supported by substantial evidence, and must remand this issue so that Commerce may reconsider its determination. "[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

 Unlike TKS, MHI "does not dispute that *the* foreign like product under investigation consists of all merchandise within the scope of the proceeding." MHI Brief at 38. However, MHI argues that it sold only LNPP systems in the United States and therefore, Commerce erred in basing CV profit and SG & A on combined home-market sales of LNPP systems and LNPP components and additions. According to MHI, the statute requires that constructed value shall include profit and SG & A derived from information regarding "the production and sale of *a* foreign like product." *Id.* (quoting

19 U.S.C. § 1677b(e)(2)(A)). The term "*a* foreign like product," MHI contends,

> is defined in section [1677(16)] ... as those products most closely resembling the products sold in the United States. By equating the term 'a foreign like product' (meaning similar products) to the term 'the foreign like product,' (meaning the entire pool of products), ITA used SG & A and profit amounts in its calculations that were unrepresentative of LNPP system sales being examined in the investigation.

*Id.* at 38–39.

In framing its argument, MHI has misquoted the statute. Section 1677(16) does not define the term "a foreign like product," it defines the term "foreign like product." *See* 19 U.S.C. § 1677(16). There is nothing in the statute to require Commerce to calculate profit based on subsets of merchandise within the foreign like product. Therefore, Commerce's definition of foreign like product upon remand is not restricted to MHI's reading of 19 U.S.C. § 1677(16).

### 4. *Sales with "Abnormally High Profits"*

 MHI also argues that in calculating profit and SG & A expenses, Commerce should have excluded certain sales, characterized by MHI as having "abnormally high profits." In its final determination, Commerce explained,

> [w]e disagree with respondents that simply because certain home market sales had profits higher than those of numerous other sales, the profits are automatically abnormally high and outside the ordinary course of trade for purposes of computing CV profit. In order to determine that profits are abnormally high, there must be certain unique or unusual characteristics related to the sales in question. However, the respondents have provided no credible information other than the numerical profit amounts to support their contention that certain home market sales had abnormally high profits.

Germany Final at 38,178.

MHI argues that the SAA "made it clear, ... that 'sales with abnormally high profits' should be considered outside the ordinary

course of trade for purposes of the calculation of SG & A and profit." MHI Brief at 37 (citing SAA at 839–40). In fact, the SAA says that Commerce should base SG & A and profit on sales made in the ordinary course of trade, and that "... examples of sales that Commerce *could* consider to be outside the ordinary course of trade include sales of off-quality merchandise, sales to related parties at non-arm's length prices, and sales with abnormally high profits." SAA at 839 (emphasis added). Thus, Congress granted Commerce discretion to decide under what circumstances highly profitable sales would be considered to be outside of the ordinary course of trade. Commerce's decision to require additional evidence before excluding such sales was a reasonable exercise of that discretion.

In order for Commerce to exclude sales found to have been made *below* the cost of production, the statute requires that Commerce provide additional evidence demonstrating that such sales were actually outside the ordinary course of trade. *See* 19 U.S.C. § 1677b(b)(1). Similarly, Commerce's decision to require additional evidence demonstrating that sales with higher profits were outside of the ordinary course of trade was consistent with the statutory scheme and a reasonable construction of the provision at issue.

### 5. *Major Inputs from Affiliated Suppliers*

In calculating constructed value, Commerce required MHI to identify all suppliers that provided inputs accounting for at least two percent of the total cost of materials, labor and overhead of any press component, or five percent or more of the total cost of materials, labor and overhead of a complete press system. Commerce also required information about MHI's commercial relationships with the suppliers identified and detailed cost of production data for the inputs received from them.

Based on the submitted data, Commerce concluded that certain of the suppliers were "affiliated persons" with MHI as defined at 19 U.S.C. § 1677(33) and that these "affiliated persons" had supplied "major inputs" to

MHI, pursuant to 19 U.S.C. § 1677b(f)(3). Section 1677b(f)(3) provides as follows:

> If, in the case of a transaction between affiliated persons involving the production ... of a major input to the merchandise, the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input, then the administering authority may determine the value of the major input on the basis of the information available regarding such cost of production,....

MHI argues that Commerce's threshold for identifying a "major input" here—an input having the value of at least two percent of the value of one of the five press components or five percent or more of the value of a total press system—was inconsistent with the statute and with Commerce's past practice. In previous "post-URAA proceedings," MHI argues, Commerce "has consistently defined 'major input' as an input which represents a 'significant percentage' of the *total cost* of manufacture for the subject merchandise." MHI Brief at 39–40.

Commerce disputes MHI's contention that it failed to apply its normal "significance" test. 61 Fed.Reg. at 38,162. Commerce stated,

> [i]n a typical case in which the subject merchandise only requires a few inputs, we agree that a threshold of two percent for defining a major input appears low. However, in this case, LNPPs require thousands of inputs, with no single input representing a large share of the total LNPP cost.... Accordingly, since the inputs we tested represent the most significant inputs used to produce the subject LNPPs, we consider it appropriate in this instance to categorize inputs meeting the two percent threshold as major inputs.

*Id.*

The statute does not contain a definition of a "major input." Therefore, the Court will defer to Commerce's interpretation of the term, if the interpretation is reasonable.

The special rule for major inputs was added to the antidumping law in 1988 "to ad-

dress diversionary input dumping by authorizing Commerce to inquire whether the transfer between 'related' persons (*i.e.,* 'affiliated' persons under section [1677b(f)(3) ] ) of such an input is at a price below the input's production cost." SAA at 838 (citing H. Rep. 576, 100th Cong., 2d Sess. 595 (1988)).

Commerce found that MHI "obtained from affiliated suppliers numerous inputs representing over two percent of the total cost of a component (none of which represent more than five percent of the LNPP total production cost), the sum of which represents a significant portion of the total LNPP cost of production." Japan Final at 38,162. If Commerce had defined "major inputs" as MHI suggested, to mean inputs worth between ten and twenty percent of the subject merchandise, it would have been unable to examine any inputs supplied to MHI by related parties, *see* Commerce Brief at 76 (citing Japan Final, 61 Fed.Reg. at 38,162), thus frustrating the Congressional intent that certain inputs supplied by related parties be scrutinized to prevent "diversionary dumping." Therefore, in this case, it was reasonable for Commerce to set the threshold for defining a major input lower than it has in past determinations.

Having appropriately decided to set the threshold at a lower level than would be typical, Commerce was obliged to choose a specific number for purposes of administration. The nature of this choice made a certain degree of randomness unavoidable. It is difficult, for example, to distinguish between two percent and three percent, or between five percent and six percent. This difficulty was exacerbated by the complexity of the subject merchandise as well as the large number of parts and suppliers involved.

In order to make its choice, Commerce was required to, "reason its way to a decision without pretending that that decision reflected some degree of rational perfection...." *Fishermen's Dock Co-op. Inc. v. Brown,* 75 F.3d 164, 173 (4th Cir.1996). "Where the agency's line-drawing does not appear irrational and the [plaintiff] has not shown that the consequences of the line-drawing are in any respect dire ... we will leave that line-drawing to the agency's dis-

cretion." *Leather Indus. v. Environmental Protection Agency,* 40 F.3d 392, 409 (D.C.Cir.1994).

Here, Commerce quoted a letter from MHI stating that for one of the two POI sales, " 'if a major input were defined as any input accounting for one percent of total purchase price ... 90 percent of the ... suppliers could be ignored because their sales fall below this figure.' " Japan Final, 61 Fed.Reg. at 38,162 (quoting MHI August 24, 1995 Submission, N–P doc. 8 at 3). Furthermore, the record demonstrates that of MHI's many suppliers, few were required to provide cost data. *See* Response of Mitsubishi Heavy Industries, Ltd. to Antidumping Section A Qr: Questions Relating to Affiliated Parties, Costs and Documentation, N–P doc. 105, Exs. 7 and 8. Based on the evidence before it, Commerce's decision to set the threshold at two percent of an LNPP component or five percent of an LNPP system was a permissible exercise of its discretion. The thresholds set by Commerce represent a reasonable attempt to comply with the requirement that the inputs at issue be "major inputs"—and to ensure that respondent is not excessively burdened—while at the same time addressing the potential for price manipulation presented by affiliated party transactions.

■ MHI also argues that Commerce "failed to articulate a basis for its finding that certain companies were affiliated with MHI." MHI Brief at 42. The statute defines "affiliated persons" as follows:

(A) Members of a family, including brothers and sisters....

(B) Any officer or director of an organization and such organization.

(C) Partners.

(D) Employer and employee.

(E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

(F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.

(G) Any person who controls any other person and such other person.

19 U.S.C. § 1677(33).

Commerce argues that "determination of affiliation may be based on a close supplier relationship," Japan Final at 38,163, citing 19 U.S.C. § 1677(33)(G), which defines affiliated persons to include "any person who controls any other person and such other person." Commerce's interpretation is supported by the SAA.

> The traditional focus on control through stock ownership fails to address adequately modern business arrangements, which often find one firm "operationally in a position to exercise restraint or direction" over another even in the absence of an equity relationship. A company may be in a position to exercise restraint or direction, for example, through corporate or family groupings, franchises or joint venture agreements, debt financing, or close supplier relationships in which the supplier or buyer becomes reliant upon the other.

SAA at 838.

However, it is not clear to the Court on what basis Commerce determined that the suppliers at issue here were affiliated with MHI. Commerce requested that MHI list inputs obtained from suppliers that furnished more than 50 percent of their total annual sales to MHI, but stated that "we never indicated that this constitutes affiliation." Japan Final at 38,163. At oral argument, Commerce agreed with MHI that it had failed to explain why it treated certain parties as affiliated and requested that the Court remand this issue so that it might provide an explanation of its standard.

"The agency must articulate a 'rational connection between the facts found and the choice made.'" *Bowman Transp., Inc. v. ArkansasBest Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)(quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable." *SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). Here, as it acknowledged, Commerce failed to state the basis upon which it determined that the suppliers identified by MHI were affiliated. Therefore the Court remands this issue so that Commerce may reevaluate its determination.

■■■ Goss objects to Commerce's failure to treat a trading company ("Trading Company") [14] involved in MHI's sale to Piedmont Publishing Company as an affiliated party with MHI. Goss Brief at 11–12.

The statute defines "affiliated persons" to include "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person." 19 U.S.C. § 1677(33)(F). MLP is a joint venture between MHI and Trading Company. Goss argues that MHI and Trading Company control a third person, MLP, and that therefore, MHI and Trading Company must be treated as affiliated persons. Goss Brief at 12.

In response, Commerce states that "[t]he MLP joint venture between MHI and the trading company does not in and of itself constitute control between MHI and the trading company." Japan Final at 38,157. Furthermore, Commerce argues, information provided by MHI did not support "the precondition for affiliation [for purposes of subsections (F) and (G) of 19 U.S.C. § 1677(33) ]: that MHI was 'legally or operationally in a position to exercise restraint or direction over' Trading Company." Commerce Brief at 83 (citing 19 U.S.C. § 1677(33)).

Commerce's actions here were not consistent with the statute. The statutory definition of affiliated parties at 19 U.S.C. § 1677(33)(F) does not require that MHI and Trading Company exercise control over each other. The statute requires only that "two or more persons," control a third person. *Id.*

Commerce's determination is based on a misreading of the statute. Therefore, the Court is remanding for Commerce to reeval-

---

**14.** The name of the trading company is proprietary information.

uate its determination as to whether MHI and Trading Company are affiliated.

## IV. THE EXCLUSION OF TKS'S FOUR-HIGH TOWER UNIT SALE TO THE DALLAS MORNING NEWS

 TKS objects to Commerce's refusal to exclude its sale of a certain press addition to the Dallas Morning News ("DMN"), describing the sale as "highly unusual." According to TKS, "ITA maintains discretion to exclude a U.S. sale in calculating the margin in an antidumping investigation." TKS Brief at 40 (citing *Ipsco Inc. v. United States*, 13 CIT 402, 408, 714 F.Supp. 1211, 1217 (1989) *rev'd on other grounds*, 965 F.2d 1056 (Fed. Cir.1992)).[15] In this case, TKS argues, "ITA's failure to exclude the aberrational . . . DMN sale violates the law's 'fair comparison' requirement, because its inclusion unfairly inflates the duty deposit rate by a large percentage, while its exclusion would not impede ITA's margin calculation in any way." TKS Brief at 41.

 Commerce's decision not to exclude the DMN sale was consistent with both the statute and relevant case law. "As the court has made quite clear, regular exclusion of sales not in the ordinary course of trade *only* occurs on the home-market-sales side of the price comparison." *American Permac, Inc. v. United States*, 16 CIT 41, 42, 783 F.Supp. 1421, 1423 (1992) (emphasis supplied). The reason for this is that according to the statute, the normal value of the subject merchandise is the price "at which the foreign like product is first sold . . . in the exporting country, in the usual commercial quantities and in the ordinary course of trade. . . ." The definition of export price, however, does not include an "ordinary course of trade" provision.[16] *See IPSCO,*

*Inc. v. United States*, 12 CIT 384, 394, 687 F.Supp. 633, 640–41 (1988) ("Congress has provided for numerous adjustments, allowances and exclusions on each side of the fair value equation in order to insure the fairest possible comparison between markets. . . . In light of this detailed framework, the court may assume that if Congress intended to require the administering authority to exclude all sales made outside the 'ordinary course of trade' from its determination of United States price it could have provided for such an exclusion. . . . It has not done so.") At the same time, the *American Permac* court explained, "[i]t does not follow inexorably, however, that every U.S. sale of the merchandise under investigation must be included in every case. . . . The distinction is that while U.S. sales outside the ordinary course of trade ordinarily should be included (this may be the very cause of injury), a methodology is to be applied which accounts for sales which are unrepresentative and which do not lead to a fair price comparison." 16 CIT at 42, 783 F.Supp. at 1423.

Commerce distinguished the sale at issue here from sales it chose to exclude in other cases. Commerce explained that although in the past it has excluded some U.S. sales, specifically, sample sales, trial sales, and sales of damaged merchandise, "[i]n those cases, the transactions involved stood by themselves; that is, they were of commodity products which were not directly related to other sales. For example, . . . a printer would never be bound to a paper supplier just because it tried a free roll of normal quality paper. . . ." Japan Final at 38,151.

On the other hand, Commerce noted, "[s]ales of LNPP, . . . are of expensive, customized capital equipment which actually

---

**15.** In fact, the passages TKS quotes in support of its assertion that Commerce has the discretion to exclude aberrational sales from the calculation of U.S. price were merely dicta. The court has not yet determined whether "Commerce has discretion under the statute to exclude nonrepresentative sales from United States price and what the contours of that discretion should be." *Bowe Passat Reinigungs–Und Waschereitechnik Gmbh v. United States*, 20 CIT ——, 926 F.Supp. 1138, 1149 (1996). The Court need not decide that question here. "That issue will arise when Commerce's decision to exclude a nonrepresentative

sale is challenged before the court and the court is called upon to decide whether such an application of the statute constitutes a permissible construction." *Id.* Resolution of this case requires only that the Court decide whether Commerce's decision to include TKS's DMN sale was a permissible interpretation of the statute.

**16.** *American Permac* was decided under the pre–URAA version of the antidumping statute. However, this aspect of the statute was not changed by the URAA.

change the nature of the printer's operations.... [I]n light of the duration of relations between TKS and the DMN, one can reasonably interpret this sale as part of an over-arching marketing strategy vis-a-vis a long-term business relationship with the DMN, i.e., as a loss leader sale." *Id.*

Moreover, Commerce explained, "[t]he Department's discretion to exclude sales must take into account the fact that there is such a small pool of sales which are available for analysis. Because the Department is not convinced that the DMN sale in question was so unusual that it should be disregarded, we are including this sale in our final analysis,...." *Id.*

Commerce's decision to include the DMN sale was consistent with the statute and case law, as well as Commerce's own practice in past investigations. It was also reasonable, in light of the small pool of sales available for analysis. Therefore, the Court will sustain Commerce's determination on this issue.

## CONCLUSION

For the reasons stated above, Commerce's final determination in *Large Newspaper Printing Presses from Japan,* 61 Fed.Reg. 38,139 (Dep't Commerce 1996)(final det.) is remanded for Commerce to correct its error in allocating respondents' indirect selling costs incurred in Japan, explain its decision to adjust normal value for imputed credit expenses, reconsider its decision to treat LNPPs sold in the home market as foreign like product, reevaluate its decision to treat certain of MHI's suppliers as affiliated parties and reconsider its decision not to treat Trading Company and MHI as affiliated parties. Commerce's determination is sustained in all other respects.

### ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in conformity with said decision, it is hereby

ORDERED that the Department of Commerce's final determination in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan,* 61 Fed.Reg. 38,139 (Dep't.

Commerce 1996), as amended by *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, from Japan,* 61 Fed.Reg. 46,621 (Dep't Commerce 1996) (antidumping duty ord. and amendment to final det.) is sustained in part and remanded in part; and it is further

ORDERED that this case is remanded to the Department of Commerce, International Trade Administration to correct its error in allocating respondents' indirect selling costs incurred in Japan, explain its decision to adjust normal value for imputed credit expenses, reconsider its decision to treat LNPPs sold in the home market as foreign like product, reevaluate its decision to treat certain of MHI's suppliers as affiliated parties and reconsider its decision not to treat Trading Company and MHI as affiliated parties; and it is further

ORDERED that remand results are due on Tuesday, August 4, 1998; comments and responses thereto are due on Tuesday, August 25, 1998; any rebuttal comments are due on Monday, September 7; and it is further

ORDERED that Commerce's final determination is sustained in all other respects.